Johnnie M. CLIFF, Plaintiff–Appellant,

v.

BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS, INDIANA, Mary Busch, Donald Payton, et al., Defendants–Appellees.

No. 93–2498.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1994.

Decided Dec. 9, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 7, 1995.

John O. Moss (argued), Indianapolis, IN, for plaintiff-appellant.

John B. Drummy, Donald L. Dawson, Thomas E. Wheeler (argued), Kightlinger & Gray, Indianapolis, IN, for defendants-appellees.

Before GODBOLD,* FLAUM, and ROVNER, Circuit Judges.

* The Honorable John C. Godbold, of the Eleventh Circuit, sitting by designation.

ILANA DIAMOND ROVNER, Circuit Judge.

Johnnie Cliff taught mathematics and chemistry in the Indianapolis public school system for approximately twenty-eight years before the Board of School Commissioners of the City of Indianapolis ("IPS" or the "Board") voted not to renew her contract for the 1988–89 school year. IPS maintains that its decision was prompted by a series of unsatisfactory performance reviews which indicated that Cliff's effectiveness in the classroom had been compromised by her inability to control her students. Yet Cliff contends that the Board's decisions can be linked to unlawful race, sex, and/or age discrimination.[1] She also charges that IPS engaged in a series of retaliatory acts against speech protected by the First Amendment. The district court granted IPS' motion for summary judgment, finding on the retaliation claims that Cliff's statements did not constitute speech on a matter of public concern, and on the discrimination claims, that Cliff had not shown IPS' legitimate, non-discriminatory reasons for its employment decisions to be pretextual. Cliff challenges those conclusions in this appeal, but we agree with the district court and thus affirm its judgment.

## I. BACKGROUND

IPS hired Cliff in 1960 to teach mathematics and science, and in 1972, she began exclusively to teach math at Broad Ripple High School ("BRHS"). Between 1972 and 1984, Cliff's immediate supervisor was Clyde Hochstedler, the Math Department Head at BRHS. Although Hochstedler generally had given Cliff satisfactory performance reviews in the past, during the 1984–85 school year, he noted that Cliff had difficulty maintaining control of her classroom. Hochstedler recommended avenues for improvement and indicated that he would recommend Cliff's dismissal unless she improved. Cliff objected to Hochstedler's conclusions and maintained in a statement attached to the review that she should not be held responsible for the rude and disrespectful behavior of her students. Cliff also filed a grievance under the collective bargaining agreement between IPS and the teacher's union (the "CBA") protesting this evaluation. Cliff's grievance asserted that any problems resulted from the overly large classes she had been assigned and not from any deficiencies in her teaching. By way of relief, the grievance requested that the size of Cliff's classes be reduced and that she receive help with classroom discipline. The grievance also indicated that Cliff should not be re-evaluated during the 1985–86 school year, as IPS had proposed, because she was a tenured teacher who had not requested a second evaluation. Although IPS determined to proceed with the proposed evaluation, Cliff voluntarily withdrew her grievance on November 6, 1985.

Karen Shepard replaced Hochstedler as Math Department Head at the close of the 1984–85 school year. Shepard observed Cliff's math classes a number of times the following year and summarized her findings in an April 28, 1986 evaluation. Shepard found Cliff unsatisfactory in her ability to motivate students and to maintain discipline and control over the classroom. Rather than recommending Cliff's dismissal, however, Shepard suggested that IPS renew Cliff's contract subject to a Performance Improvement Plan ("PIP").[2] Cliff subsequently filed a grievance addressed to this review, contending that Shepard's evaluation and recommendation violated the CBA. After this grievance was set for arbitration, it too was voluntarily withdrawn by Cliff's representatives.

On February 28, 1986, Cliff applied for the position of science/math technical applications teacher at Crispus Attucks High School ("CAHS"). IPS decided, however, that she was not the most qualified applicant and denied Cliff this transfer.

1. Cliff is an African–American female who was over fifty years of age when IPS failed to renew her contract.

2. Under the CBA, if a teacher receives more than a designated number of unsatisfactory grades on her evaluation, "the evaluator is to recommend Renewal of the Contract with Performance Improvement Plan." The teacher then has "the following school year to implement the strategies recommended on the Performance Improvement Plan and to meet proficiency." (R. 530, Ex. E, App. D at 7.)

In January 1987, Cliff and the teacher's union complained that Cliff was not receiving sufficient support in meeting the goals of her PIP. In response to these complaints, BRHS' principal, Donald A. Glenn, asked Dr. Thomas Clark, IPS' mathematics supervisor, to observe and to critique Cliff's teaching strategies.[3] Clark noted many of the same deficiencies that had been identified by Hochstedler and Shepard, and he too offered oral and written recommendations for improvement. Yet in her discussions with Clark, Cliff again blamed any discipline problems on the size of her classes and on the lack of support from the BRHS administration. She also told Clark that Glenn and Shepard were discriminating against her in the evaluation process due to her age and race.

At the same time that Clark was offering his assistance, Shepard was observing and evaluating Cliff for purposes of her 1986–87 performance review. During the first semester of that school year, Shepard perceived little or no improvement in Cliff's performance. Yet by the second semester, Shepard noted that Cliff had become more receptive to outside advice and that her teaching strategies and command over the classroom had improved accordingly. Although Shepard still assigned Cliff unsatisfactory grades in a number of areas, she did not advocate termination but again recommended that Cliff's contract be renewed subject to a PIP. Cliff then exercised her right under the CBA to request a second evaluation, and Madora Walker, an African–American female and Math Department Head at another Indianapolis high school, was chosen as the evaluator. After observing Cliff's classes on several occasions, Walker found deficiencies in a number of areas and echoed many of Shepard's concerns with classroom discipline.

Cliff grieved these evaluations on May 22, 1987, again complaining that the evaluation process violated the CBA. The matter was submitted to arbitration, and on October 28, 1987, a hearing was held before a jointly-selected arbitrator, who subsequently made the following findings:

It would serve no useful purpose to repeat the plentiful details of the proof presented at the Hearing concerning the deficiencies in [Cliff's] teaching performance since 1985. It is undenied that the General Mathematics classes assigned to Ms. Cliff consist of many indolent pupils who constitute a severe challenge to the professional skills and emotional stability of any teacher. The other teachers at BRHS have these same recalcitrant students and meet the challenge. The overwhelming weight of credible evidence presented by IPS requires a finding of fact that it has proved that the evaluations were not flawed by being arbitrary, capricious or discriminatory. Two evaluators with different racial origins and both Heads of Mathematics Departments at different IPS High Schools reached substantially similar conclusions from their classroom observations of [Cliff]. In eight or more specific requirements, Ms. Cliff had failed to perform competently. The School Board exercised its right to determine that Grievant's performance as a teacher was unsatisfactory and the evidence of record in this case strongly supports that judgment and cannot be altered.

(R. 530, Ex. O at 6–7.)

While Cliff's grievance was proceeding and before the arbitrator had rendered a decision, Shepard resigned as BRHS' Math Department Head. Moreover, the position of Math Department Head at Emmerich Manual High School ("EMHS") also became vacant. Cliff applied for both positions in August 1987, but of the ten applicants, she received the lowest rating from the placement committee.[4] Lana Cardwell, a forty-three-year-old Caucasian female ultimately replaced Shepard at BRHS, and a forty-six-year-old Caucasian male became EMHS' Math Department Head.

Cardwell then observed and evaluated Cliff during the 1987–88 school year. In her summary evaluation, Cardwell cited the same deficiencies noted by the previous evaluators and also found that Cliff had failed to meet

---

**3.** Clark, like Cliff, is African–American.

**4.** Three of the ten applicants were African–American, and three were women.

the goals of her second-year PIP. Cardwell noted, moreover, that Cliff continued to absolve herself of any responsibility for the disciplinary problems in her classroom. As a result of this evaluation, Cardwell recommended that Cliff's contract not be renewed.

Cliff requested a second evaluation under the CBA, and Clark was appointed to perform this task. After again observing her classes, Clark found Cliff "to be primarily ineffective in the classroom." (R. 530, Ex. S.) He indicated that students have little or no respect for Cliff and that they often are openly defiant. Clark found Cliff's attempts at discipline to be tentative, inconsistent, and generally ineffective. Like Cardwell, then, Clark recommended that Cliff's contract not be renewed.

As Cliff was being re-evaluated, she requested a transfer to the chemistry department at Arsenal Technical High School ("ATHS"). Cliff maintained that she would be a more effective teacher in the ATHS science magnet program. IPS denied this request, citing Cliff's substandard evaluations and the fact that she had last taught chemistry in 1972.

By letter dated March 25, 1988, the Board notified Cliff that it would consider the cancellation of her contract at its April 26, 1988 meeting. The letter explained:

> You have a right to a hearing before the Board of School Commissioners on the reason for the proposed cancellation of your contract. If you desire such a hearing, you must file a written request for a hearing with me within fifteen (15) days after receipt of this letter, and thereafter you will be notified of the time and place of such hearing.

(R. 529, Ex. A.) Cliff requested a hearing and also filed another grievance under the CBA. The Board scheduled a hearing for May 16 and postponed its consideration of Cliff's contract until May 24. Yet, in an April 14, 1988 letter to the Board, Cliff withdrew her request for a hearing and asked that the Board defer any hearing as well as its decision until the arbitrator ruled on her latest grievance. The Board refused to defer its decision, but it canceled the May 16 hearing at Cliff's request. The Board proceeded to consider the status of Cliff's contract at its May 24 meeting, and approximately three weeks later, it voted not to renew that contract. The arbitrator subsequently conducted a hearing on Cliff's grievance, and on November 21, 1988, concluded that the Board had not violated the CBA and that Cliff had produced no evidence linking her negative evaluations to either race or age discrimination.

After exhausting her administrative remedies, Cliff filed the instant action in federal court, alleging a variety of race, sex, and age discrimination claims. She also charged that IPS had retaliated against speech that was protected by the First Amendment. The district court granted IPS' motion for summary judgment as to all of Cliff's claims, finding that IPS had refused to promote Cliff and had ultimately terminated her employment not for any discriminatory reason, but because Cliff's classroom performance had failed to meet the Board's reasonable expectations. The court also found that because Cliff's speech had not addressed a matter of public concern, it was not protected by the First Amendment.

## II. DISCUSSION

We review de novo the grant of summary judgment in IPS' favor, construing the evidence in the light most favorable to Cliff and according her the benefit of all reasonable inferences. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir.1994). Although it initially is the burden of the moving party to demonstrate that there is no genuine issue of material fact that would require a trial, once the movant has met that burden, the non-movant must point to evidence in the record "that would reasonably permit the finder of fact to find in her favor on a material question." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The non-movant does not satisfy its burden merely by pointing to self-serving allegations that otherwise are without evidentiary support. *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir.1993).

Moreover, the non-movant also will not defeat summary judgment on a discrimination charge "simply because issues of motive or intent are involved" if she fails to produce evidence of a motive or intent that would support her position. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1109 (7th Cir.1992); *see also Morgan v. Harris Trust & Sav. Bank*, 867 F.2d 1023, 1026 (7th Cir.1989). Absent evidence presenting a factual issue on a material question, summary judgment must enter. *Waldridge*, 24 F.3d at 920. We address Cliff's appeal with these familiar standards in mind.

## A.

■ We first consider Cliff's 42 U.S.C. § 1983 claim, which alleges that IPS violated her First Amendment rights by retaliating once Cliff complained about the large math classes she had been assigned and about the general disorder at BRHS. The district court found that Cliff's speech did not warrant First Amendment protection because she had spoken on a matter of private rather than public concern. Cliff argues on appeal that because issues of class size and student discipline in a public high school are inherently matters of public concern, the district court erred in finding otherwise. Although we can agree that Cliff's complaints addressed a subject of general interest to the public, her claim still fails as a matter of law because her expression was addressed only to the personal impact of those issues on Cliff. Her speech was thus intended to benefit only her personal interests in a private dispute with her employer.

■ Not all speech by public employees is protected by the First Amendment such that constitutional concerns are raised if a public employer retaliates in response to that speech. *Smith v. Fruin*, 28 F.3d 646, 650 (7th Cir.1994), *petition for cert. filed* (U.S. Nov. 14, 1994); *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 585 (7th Cir.

1992); *see also Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983). Before speech will be protected, it must address a matter of public concern, and the speaker's interest in her expression "must not be outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ. of Township High Sch. Dist.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *see also Waters v. Churchill*, —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994); *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687. Yet we need not undertake to balance the respective interests of the speaker and the State unless the speaker first establishes that her speech addressed a matter of public concern. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90; *Belk v. Town of Minocqua*, 858 F.2d 1258, 1262 (7th Cir.1988); *Callaway v. Hafeman*, 832 F.2d 414, 416 (7th Cir.1987). That threshold question is one of law for the court. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir.1994).

■ We must therefore determine whether Cliff's complaints about the size of her math classes and the general disorder at BRHS addressed a matter of public concern. *Connick* requires that we consider "the content, form, and context" of Cliff's statements as revealed by the record as a whole (461 U.S. at 147–48, 103 S.Ct. at 1690–91), and our cases indicate that of these three, content is the most important. *Marshall*, 32 F.3d at 1219; *Smith*, 28 F.3d at 651; *Belk*, 858 F.2d at 1264. The motive which underlies an employee's statements is a relevant but not necessarily dispositive factor. *Marshall*, 32 F.3d at 1219; *Colburn*, 973 F.2d at 586; *Belk*, 858 F.2d at 1264; *see also Hartman v. Board of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 471 (7th Cir.1993).[5]

---

5. Our concern with motive derives from the following passage in *Connick*:

> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most

unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

A number of our cases thus direct attention to " 'the point of the speech in question; was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " *Smith,* 28 F.3d at 651 (quoting *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985) (emphasis deleted)); *see also, e.g., Zorzi v. County of Putnam,* 30 F.3d 885, 897 (7th Cir.1994); *Marshall v. Allen,* 984 F.2d 787, 795 (7th Cir.1993); *Phares v. Gustafsson,* 856 F.2d 1003, 1008 (7th Cir.1988); *Callaway,* 832 F.2d at 417. Yet we also have indicated that motive cannot rise to the level of an absolute litmus test because it does not supplant content in terms of overall importance to the public concern inquiry. *Zorzi,* 30 F.3d at 897; *Belk,* 858 F.2d at 1264; *Berg v. Hunter,* 854 F.2d 238, 242–43 (7th Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). Thus, the fact that an employee speaks at least in part for personal reasons will not automatically deprive her statements of the protections afforded to speech on a matter of public concern. *Marshall,* 32 F.3d at 1219; *Zorzi,* 30 F.3d at 897; *Smith,* 28 F.3d at 653; *Colburn,* 973 F.2d at 587; *Berg,* 854 F.2d at 242; *Auriemma v. Rice,* 910 F.2d 1449, 1460 (7th Cir.1990), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). Instead, the speaker's personal motive is considered along with the other *Connick* factors. *Smith,* 28 F.3d at 651; *see also Zorzi,* 30 F.3d at 897.

Cliff contends that her statements about class size and the lack of student discipline at BRHS are inherently matters of public concern. According to Cliff, her complaints were designed to call attention to these problems and to thereby improve the efficiency and integrity of the high school's operations. We have no doubt that the problems Cliff addressed are of widespread interest to members of the community, and particularly so to parents whose children attend BRHS. In a society increasingly concerned with the quality of public education, unusually large classes and general disorder in a public high

school may be perceived as fostering an atmosphere that is less than conducive to the accomplishment of the school's educational mission. In that sense, the community would no doubt be interested in the comments of an experienced teacher like Cliff on such matters. As we recently reiterated, however, "the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [her] remarks on that subject protected." *Smith,* 28 F.3d at 646; *see also Hartman,* 4 F.3d at 471 (whether speech is of public concern does not turn on the general subject matter of the employee's speech); *Colburn,* 973 F.2d at 586 ("the fact that the issue could be 'interesting' to the community does not make it an issue of public concern."); *Callaway,* 832 F.2d at 417 (although incidences of sexual harassment in a public school would be of concern to the public, employee's complaints not automatically protected); *Ferrara v. Mills,* 781 F.2d 1508, 1515 (11th Cir.1986). We must instead delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public. *See Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Indeed, we recently observed that the public concern element is lacking as a matter of law if speech "concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee...." *Marshall,* 32 F.3d at 1219 (emphasis in *Marshall*) (citing *Smith,* 28 F.3d at 651–52); *see also Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1503–04 (7th Cir.1994); *Colburn,* 973 F.2d at 585 (court must determine whether the speaker is speaking "more like a citizen or a disgruntled employee whose statements are primarily of personal interest.").

Consideration of the *Connick* factors here convinces us that the district court correctly characterized Cliff's speech as merely of private rather than public concern. The record as a whole belies Cliff's assertion that she spoke in order to call public attention to the problems addressed. It establishes instead that Cliff complained only in response to

461 U.S. at 147, 103 S.Ct. at 1690; *see also Marshall v. Allen,* 984 F.2d 787, 795 (7th Cir. 1993).

criticism directed at her classroom performance in her annual reviews—criticism primarily relating to Cliff's inability to control her students and to maintain order in her classroom. Indeed, Cliff filed her initial grievance only after receiving a number of unsatisfactory marks on her 1984–85 review. That grievance addressed the class size and disciplinary problems not in general terms, but in the context of Cliff's own circumstances. For example, Cliff personally found it "very hard to maintain discipline effectively in these overcrowded classroom situations," and she asked "to have [her] class sizes reduced" and for "help with classroom discipline." (R. 530 Ex. D.) Furthermore, in discussing her review with Hochstedler, Cliff maintained that she was being treated differently from the other math teachers in that only she was being assigned such an abundance of large classes. (*See* Cliff Dep., R. 531 at 23–24.) According to Cliff, therefore, the size of her math classes was contributing to the lack of order in her classroom.[6]

Cliff's complaints were therefore on her own behalf and in her own interest. *See Smith*, 28 F.3d at 651. She was not speaking for other teachers at BRHS; indeed, there is nothing in the record to suggest that other teachers had similar difficulties maintaining order in their classrooms. *See Ferrara*, 781 F.2d at 1516 (teacher's own inability to govern his students is a matter of interest only to him). Moreover, Cliff was not asking that the size of classes at BRHS be reduced across the board; she was instead concerned only with the size of her own math classes. Indeed, Cliff pointed to the smaller classes that allegedly had been assigned to her math department colleagues to support her claim of unfair treatment.

We also think it clear that Cliff was not, as she maintains, attempting to call public attention to these matters, as she limited her complaints to private conversations and to the CBA grievance procedure without taking the issue to the public in any way. Although we recognize that employee speech does not go unprotected when made only in a private

rather than a public setting (*see Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979); *Smith*, 28 F.3d at 652), it is apparent that Cliff complained here only to bolster her own position in a private personnel dispute with her superiors. *See, e.g., Colburn*, 973 F.2d at 587 ("where the overriding reason for the speech is the concerns of a few individuals whose careers may be on the line, the speech looks much more like an internal personal dispute than an effort to make the public aware of wrongdoing."); *Phares*, 856 F.2d at 1008 (plaintiff did not attempt to call public attention to an issue when he raised it only through the university's internal grievance procedures); *Callaway*, 832 F.2d at 417 (plaintiff spoke as an employee attempting to resolve a personal dilemma rather than as a citizen concerned with problems facing the school district). Thus, although Cliff's complaints may have touched tangentially on issues of interest to the public, that fact does not "transform [this] purely private personnel matter into a matter of public concern." *Phares*, 856 F.2d at 1008; *see also Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8; *Ferrara*, 781 F.2d at 1516. Because the content, form, and context of Cliff's speech establishes that it was not addressed to a matter of public concern, her retaliation claims fail as a matter of law.

**B.**

Cliff next alleges under a variety of federal statutes and the Equal Protection Clause of the Fourteenth Amendment that IPS discriminated against her on the basis of race, age, and sex when it terminated her employment. The district court granted summary judgment, finding that Cliff had failed to rebut IPS' legitimate, non-discriminatory reason for its employment decision—that Cliff was an ineffective teacher who could not control her classroom. Indeed, IPS established that it had evaluated Cliff a number of times over approximately a three-year period, that it had utilized a variety of

---

6. Moreover, in her later grievances, Cliff contended that, as a tenured teacher, she was being evaluated more frequently than the CBA would allow. This complaint also addressed only Cliff's personal situation.

different evaluators, and that the evaluators had reached remarkably consistent conclusions, in that they had identified the same or similar deficiencies in Cliff's classroom performance. Moreover, IPS showed considerable patience with Cliff between 1985 and 1988, despite the fact that her reviews were consistently unsatisfactory. Indeed, Shepard and Clark both attempted to facilitate Cliff's improvement by critiquing her performance and recommending alternative teaching strategies. It was only in 1988, after two evaluators found that Cliff had failed to live up to her second year PIP, that the Superintendent recommended cancellation of her contract.

In order to expose IPS' proffered reason as pretextual, Cliff was required to point to evidence suggesting either that the stated reason was unworthy of credence or that a discriminatory reason more likely motivated IPS' decision. *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1163 (7th Cir.1994). Cliff could establish a lack of credence either by showing: " '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge.' " *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988)). In response to IPS' evidence, Cliff came forward with nothing beyond her own conclusory assertions of discrimination to suggest that IPS' reason was unworthy of credence or that a discriminatory motive was lurking beneath the surface. Cliff was unable to dispute, for example, that she could not control the students in her math classes and, as a result, that she was generally ineffective as a teacher. She instead blamed any and all discipline problems on Glenn, who she argued was solely responsible for maintaining order at the high school. Cliff failed to show, then, that IPS' proffered reason lacked an adequate factual basis or that IPS' concerns were insufficient to motivate discharge. There also was no evidence that Cliff was treated differently from any other teachers who may have had difficulty controlling their classrooms. Indeed, she failed to show that other teachers experienced discipline problems that even approached the magnitude of her own. In the end, Cliff came forward with no evidence suggesting that IPS' stated reason did not actually motivate her discharge. She thus failed to " 'produce evidence from which a rational fact-finder could infer that [IPS] lied' about its proffered reasons for [her] dismissal." *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990)). The district court's grant of summary judgment on Cliff's race, sex, and age discrimination claims is affirmed.

## C.

Cliff also contends that IPS violated 42 U.S.C. § 1981 when it failed to promote her to the position of Math Department Head at BRHS or EMHS, when it refused her transfer requests, and when it ultimately terminated her employment. The district court found that Cliff could not maintain a claim for unlawful termination under section 1981 and, to the extent that her other claims were actionable under that statute, that Cliff had not presented evidence linking the challenged decisions to her race. On appeal, Cliff pursues under section 1981 only the Board's failure to make her a Math Department Head.

Cliff's section 1981 claims are governed by the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Although Congress significantly expanded the scope of section 1981 in the Civil Rights Act of 1991, those amendments do not apply here, as Cliff complains of conduct that preceded enactment of the 1991 Act. *See Rivers v. Roadway Express, Inc.*, — U.S. —, —— ——, 114 S.Ct. 1510, 1519–20, 128 L.Ed.2d 274 (1994). This case is thus "one of a vanishing breed to which we must apply the *Patterson* standards." *Taylor v. Western and Southern Life Ins. Co.*, 966 F.2d 1188, 1199 (7th Cir.1992). As interpreted in *Patterson*, section 1981 "prohibits only discrimination in the initial formation of a contract or in the enforcement of established contractual rights through legal processes."

*Id.; see also Patterson,* 491 U.S. at 176–77, 109 S.Ct. at 2372–73. Clearly, then, Cliff cannot state a section 1981 claim for an unlawful termination. *See Patterson,* 491 U.S. at 180, 109 S.Ct. at 2374; *McKnight v. General Motors Corp.,* 908 F.2d 104, 108 (7th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991); *see also Rivers,* —— U.S. at ——, 114 S.Ct. at 1519.

■ Whether Cliff's "failure to promote" claims are actionable depends upon whether the sought-after promotions would have resulted in a "new and distinct relation between the employee and the employer." *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. Cliff devotes much of her appeal to establishing that a "new and distinct relation" would have arisen from her promotion to Math Department Head. Yet the district court did not reject her claims on that ground. Instead, the court found, even assuming the existence of a new and distinct relationship, that Cliff had produced no evidence "from which a reasonable person could infer that [IPS] failed to make a contract with her 'because of' her race." (R. 542 at 8.) Cliff has not addressed this aspect of the district court's decision in her briefs. Yet we agree that Cliff's section 1981 claims must fail even if we assume, as the district court did, that a promotion to Math Department Head would result in a "new and distinct relation" under *Patterson.* As with the discrimination claims addressed to Cliff's termination, there is no evidence linking the school district's promotion decisions to Cliff's race. Cliff failed, then, to rebut the Board's explanation that its decisions reflected the difficulties Cliff had encountered in her own math classes and the fact that there were other, more qualified applicants.

### D.

■ Cliff finally contends that IPS violated her due process rights when it terminated her employment without providing a meaningful pre-termination hearing. The district court found that IPS had offered the required hearing but that Cliff had voluntarily waived her rights in that regard. Cliff contends on appeal that the offered hearing would not have been "meaningful" because the Board already had decided to terminate her employment. We agree with the district court that IPS was entitled to summary judgment on this claim.

■ IPS conceded below that Cliff had a property interest in her tenured teaching position so that she could not be terminated without due process of law. *Cf. Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (school security guard has property interest in continued employment). Before IPS could deprive her of that interest, Cliff was entitled to prior notice of the reasons for her discharge and to a hearing appropriate to the nature of the case. *Id.* at 542, 105 S.Ct. at 1493; *Schultz v. Baumgart,* 738 F.2d 231, 235 (7th Cir.1984). IPS offered Cliff a pre-termination hearing before the Board that would, in all likelihood, have satisfied its due process obligations. In a March 25, 1988 letter notifying Cliff that the Board would be considering the cancellation of her contract, the Superintendent explained that Cliff could request a hearing before the Board addressed to the reasons for her discharge. Cliff initially chose to take advantage of this opportunity, and the Board then scheduled a hearing for May 16, postponing its consideration of the cancellation of Cliff's contract until May 24. At the same time, Cliff filed a grievance under the CBA, and once her grievance proceeded to arbitration, Cliff officially withdrew her request for a hearing and asked the Board to defer any decision on her contract until the arbitration process was completed. In an April 25, 1988 letter, IPS acknowledged the withdrawal of Cliff's hearing request but indicated that the Board would proceed to consider the status of her contract notwithstanding the pending arbitration proceeding. Cliff then made no attempt to reinstate her request for a hearing, and the Board proceeded to consider Cliff's status at its May 24 meeting. It ultimately voted on June 13 not to renew Cliff's contract.

■ We agree that in these circumstances, Cliff waived her right to a pre-termination hearing. As we observed in *Fern v. Thorp Public School,* 532 F.2d 1120,

1134 (7th Cir.1976), the Due Process Clause does not require that a pre-termination hearing be conducted in every case. Instead, the right to such a hearing generally is waived when an employer offers a pre-termination hearing and the employee fails to accept. *See also Suckle v. Madison Gen. Hosp.,* 499 F.2d 1364, 1367 (7th Cir.1974) (employee "cannot sue in federal court to secure a right which he declined when it was voluntarily offered to him."). Decisions from other circuits are in accord. *See, e.g., Pitts v. Board of Educ. of U.S.D. 305,* 869 F.2d 555, 557 (10th Cir.1989) ("By waiving his hearing, Pitts deprived the school board of the opportunity to provide him with due process, and he gave up his right to test the correctness of the board's decision."); *Correa v. Nampa School Dist. No. 131,* 645 F.2d 814, 817 (9th Cir.1981) ("where adequate administrative procedures exist, a person cannot state a claim for denial of procedural rights when he has elected to forego a complete hearing."). Although Cliff insists that she only withdrew her request once she became convinced that the decision to terminate her employment had been made and that any hearing would be without meaning, there is nothing in the record to support her assertion. Indeed, the evidence indicates that the Board only considered the status of Cliff's contract a week after the scheduled hearing and that it did not vote until almost three weeks later. Absent contrary evidence, we must assume that the offered hearing would comport with due process. *Cf. Suckle,* 499 F.2d at 1367 (when a hearing is offered, "the offeree should assume that it will be a fair hearing until the offeror indicates otherwise."). IPS was entitled to summary judgment on this claim.

### III. CONCLUSION

Because the record reveals that Cliff complained about the size of her mathematics classes and the lack of order at Broad Ripple High School only to advance her personal interests and not to bring before the community an issue of public concern, her speech was not protected by the First Amendment. There also is no evidence to suggest that race, sex, or age discrimination was behind the Board's refusal to name Cliff a Math Department Head or its decision to cancel

her contract. Finally, IPS satisfied its obligations under the Due Process Clause when it notified Cliff of the reasons for her discharge and offered to conduct a pre-termination hearing. For all of these reasons, we AFFIRM the judgment below.