United States Court of Appeals
For the First Circuit

No. 98-1495

THOMAS CONWARD,

Plaintiff, Appellant,

v.

THE CAMBRIDGE SCHOOL COMMITTEE, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya and Stahl, Circuit Judges,

and Shadur,* Senior District Judge.

Joel P. Suttenberg for appellant.
Joseph W. Ambash, with whom Gerald M. Slater and Day, Berry &
Howard LLP were on brief, for appellees.

March 19, 1999


*Of the Northern District of Illinois, sitting by designation. SELYA, Circuit Judge. This case involves the discharge
of a tenured public school teacher for unbecoming conduct (which
the superintendent of schools reasonably classified as sexual
harassment). The ousted docent, plaintiff-appellant Thomas
Conward, sued the Cambridge School Committee and the
superintendent, Mary Lou McGrath, asseverating, inter alia, that
they had meted out discriminatorily harsh discipline because of his
race (Conward is an African American), and had violated both the
First Amendment and the Due Process Clause. The district court
granted summary judgment in the defendants' favor. See Conward v. 
Cambridge Sch. Comm., No. 96-11087-GAO, 1998 WL 151248 (D. Mass.
Mar. 24, 1998). We affirm.
I. BACKGROUND
Applying conventional summary judgment jurisprudence,
see, e.g., National Amusements, Inc. v. Town of Dedham, 43 F.3d
731, 735 (1st Cir. 1995), we sketch the events surrounding
Conward's ouster in the light most flattering to his cause,
consistent with record support.
The School Committee employed the appellant as a high-
school teacher at Cambridge Rindge and Latin School (CRLS),
Cambridge, Massachusetts, for twenty-two years. In that time, he
achieved tenure as a "professional teacher." Mass. Gen. Laws ch.
71, 41. On September 22, 1994, while supervising a study hall,
the appellant handed a female student a document entitled
"Application for a Piece of Ass" (the Application). He says that,
having read only the title, he tendered the paper as an example of
improper language because, moments earlier, the student had spelled
out an expletive. The appellant concedes that, had he perused the
document fully, he would have found it indecent the body of the
Application comprised a series of lewd questions written in a style
emulating a standard employment application and would not have
given it to a teenage girl.
Two days after this incident, the appellant received a
letter from McGrath suspending him temporarily, albeit with pay. 
The letter did not describe the reason for his suspension. On
September 28, McGrath wrote another letter requesting the appellant
to meet with her on September 30 "for purposes of an investigation
concerning your conduct as a teacher." She advised the appellant
that he could invite a lawyer and/or a union representative to
accompany him.
The appellant belonged to the Cambridge Teachers
Association (CTA), the union that represented the relevant
bargaining unit. He attended the September 30 session accompanied
by Joseph Sullivan, an attorney who doubled in brass as president
of the CTA. Immediately prior thereto, Sullivan learned from
McGrath's secretary that both the meeting and the earlier
suspension stemmed from the Application incident.
When the session began, McGrath informed the appellant
that he would be charged with conduct unbecoming a teacher for
having passed the Application to a female student. McGrath then
showed the appellant statements made by several students describing
the episode. Both McGrath and the School Committee's attorney
interrogated the appellant about the incident. He readily admitted
that he handed the Application to the pupil and explained that he
had read no more than the title at that time. The audience ended
on an ominous note: McGrath stated that she would suspend the
appellant without pay and in all likelihood would discharge him.
True to her word, McGrath again wrote to the appellant on
October 5, suspending him without pay for ten days and notifying
him of her intent to terminate his employment due to the
Application incident. This communique specifically referenced the
appellant's admission of what he had done, and explained his
entitlement to a hearing, see Mass. Gen. Laws ch. 71 42, 42D,
accompanied by counsel if he so chose, "to provide information
pertinent to the decision and to [his] status." On October 13, the
appellant, through his attorney, waived his right to such a
hearing. Seven days later, McGrath forwarded her final epistle,
discharging the appellant.
The appellant invoked the collective bargaining
agreement, lodged a grievance, and demanded arbitration. The
arbitrator found that he had been cashiered for just cause and
discerned no mitigating circumstances. The appellant retorted by
filing a claim of race discrimination with the appropriate
administrative agencies: the federal Equal Employment Opportunity
Commission and its state counterpart, the Massachusetts Commission
Against Discrimination. Following the dismissal of his
administrative claim for lack of evidence and the issuance of a
right-to-sue letter, he commenced a civil action in the federal
district court.
The appellant's complaint contained a wide-ranging
asseverational array, including claims that the defendants (McGrath
and the School Committee) had discriminated against him on the
basis of his race, abridged his right to freedom of expression,
deprived him of procedural due process, and committed acts that
gave rise to multiple state-law causes of action. In the early
going, the district court dismissed the state-law counts, and the
appellant does not question that ruling here. He concentrates his
fire instead on the district court's later grant of summary
judgment on the federal claims. It is to that ruling which we now
turn.
II. THE SUMMARY JUDGMENT STANDARD
A district court may grant summary judgment only "if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). In practice, this rule acts as a firewall to contain the
blaze of cases that are so lacking in either factual foundation or
legal merit that trial would be a useless exercise. See Celotex
Corp. v. Catrett, 477 U.S. 317, 323-24, 327 (1986); Mesnick v.
General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).
To facilitate this process, we like the trial court 
accept the properly documented facts in the light most favorable to
the nonmovant, resolving all genuine conflicts in his favor, while
at the same time refusing to indulge rank speculation or
unsupportable hyperbole. See Mesnick, 950 F.2d at 822; Medina-
Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). 
Once we have culled the essentials of the tale from the record, we
consider independently whether the movant has achieved the Rule 56
benchmark.
III. DISCUSSION
Generically, the appellant claims that the existence of
genuine issues of material fact precluded the use of summary
judgment in this case. It is against this backdrop that we mull
his three remaining claims.
A. Race Discrimination.
The appellant's principal contention is that the lower
court too hastily jettisoned his race discrimination claims. 
Although this contention flies the flags of both 42 U.S.C. 1981
and Title VII (42 U.S.C. 2000e et seq.), the subsidiary claims
hinge upon identical legal standards. See Ayala-Gerena v. Bristol
Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996). Consequently, we
discuss them together, without differentiating between the two
statutes.
Under the familiar burden-shifting framework applicable
to disparate treatment cases in which no direct evidence of
discrimination exists, the first step for any plaintiff is to
adduce a prima facie case. See McDonnell Douglas Corp. v. Green,
411 U.S. 792, 802 (1973); Mesnick, 950 F.2d at 823. Doing so
shifts to the defendant the burden of articulating a legitimate,
nondiscriminatory reason for the adverse employment action. SeeMcDonnell Douglas, 411 U.S. at 802-03; Mesnick, 950 F.2d at 823. 
If the defendant accomplishes this task, the plaintiff then
reclaims the burden of production. In order to meet this burden,
he must offer evidence showing that the defendant's proffered
reason is a sham, and that discriminatory animus sparked the
defendant's actions. See McDonnell Douglas, 411 U.S. at 804-05;
Medina-Munoz, 896 F.2d at 9. Despite these shifting burdens of
production, the plaintiff throughout retains the burden of
persuasion. See Mesnick, 950 F.2d at 823.
Under this formula, the appellant's prima facie case
normally would include a showing that he was a member of a
protected class and qualified for the employment he held, that his
employer took an adverse employment action against him, and that
his position remained open for (or was filled by) a person whose
qualifications were similar to his. See St. Mary's Honor Ctr. v.
Hicks, 509 U.S. 502, 506 (1993); Smith v. F.W. Morse & Co., 76 F.3d
413, 421 (1st Cir. 1996). Here, the parties agree (for purposes of
summary judgment) that the appellant satisfied these general
requirements. But the district court took a different tack. 
Because the appellant had based his claim of disparate treatment on
his assertion that the defendants treated his misconduct
differently (i.e., more harshly) than comparable misconduct of
other, similarly situated white teachers, the court followed the
lead of the Eleventh Circuit and construed the prima facie case
requirement to call for a "show[ing] that [the plaintiff] is a
member of a protected class, that he was qualified for the job from
which he was fired, and that the misconduct for which he was
discharged was nearly identical to that engaged in by an employee
outside the protected class whom the employer retained." Conward1998 WL 151248, at *3 (quoting Nix v. WLCY Radio/Rahall
Communications, 738 F.2d 1181, 1185 (11th Cir. 1984)). Because the
court found the appellant's comparative evidence wanting, it
rejected the race discrimination claim at the first step of the
burden-shifting pavane.
The appellant assigns error to this formulation of the
prima facie case requirement. He argues that, in a disparate
treatment case, the trial court only should consider comparative
evidence at the third stage of the progression, that is, after the
plaintiff has put forward the standard prima facie case and the
defendant has responded by articulating a legitimate,
nondiscriminatory explanation for the adverse employment action. 
We agree with the appellant's premise: the district court's
sequencing determination was in error, for the time to consider
comparative evidence in a disparate treatment case is at the third
step of the burden-shifting ritual, when the need arises to test
the pretextuality vel non of the employer's articulated reason for
having acted adversely to the plaintiff's interests. See, e.g.,
Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 749, 751 (1st Cir.
1996); Lanear v. Safeway Grocery, 843 F.2d 298, 301-02 (8th Cir.
1988); see also McDonnell Douglas, 411 U.S. at 804 (noting that
comparative evidence is "especially relevant" for a showing of
pretext); Mesnick, 950 F.2d at 824 (citing evidence of
"differential treatment in the workplace" as one example of
evidence properly used to show pretext).
We need not dwell on this error. In its rescript, the
district court made an alternative holding: that, even if it
credited the appellant with having furnished a suitable prima facie
case, the defendants nonetheless were entitled to brevisdisposition because the other incidents mentioned by the appellant
were incommensurate, and, thus, his evidence was too weak to show
at the third step of the progression that the defendants' stated
reason for firing him masked a racially discriminatory animus. SeeConward, 1998 WL 151248, at *5. We can find no fault with this
alternative rationale, and it fully supports the lower court's
entry of summary judgment on the race discrimination claims. 
Consequently, the court's erroneous sequencing determination was
harmless.
The fatal weakness of the appellant's position is that
his evidence, at whatever stage it is addressed, does not raise a
genuine issue of material fact as to the authenticity of the
defendants' professed reason for dismissing him, nor does it raise
such an issue concerning the allegation that racial animus underlay
the action. The objective of the burden-shifting framework is to
assist the factfinder in determining whether discrimination has
occurred. Despite the shifting burdens of production, the
plaintiff always remains responsible for proving such
discrimination. See Mesnick, 950 F.2d at 823. Thus, in a
disparate treatment case, "so long as the employer's proffered
reason is facially adequate to constitute a legitimate,
nondiscriminatory justification for the employer's actions, the
trial court's focus in deciding a Rule 56 motion must be on the
ultimate question, not on the artificial striations of the burden-
shifting framework." Id. at 825. In our de novo review of a
district court's summary judgment decision, we, too, must focus on
the ultimate question.
Where, as here, the plaintiff in a disparate treatment
race discrimination case offers comparative evidence in his quest
to raise an inference of racial discrimination, he must provide a
suitable provenance for the evidence by showing that others
similarly situated to him in all relevant respects were treated
differently by the employer. See Perkins, 78 F.3d at 751. 
Reasonableness is the touchstone: while the plaintiff's case and
the comparison cases that he advances need not be perfect replicas,
they must closely resemble one another in respect to relevant facts
and circumstances.
The test is whether a prudent person, looking
objectively at the incidents, would think them
roughly equivalent and the protagonists
similarly situated. Much as in the lawyer's
art of distinguishing cases, the "relevant
aspects" are those factual elements which
determine whether reasoned analogy supports,
or demands, a like result. Exact correlation
is neither likely nor necessary, but the cases
must be fair congeners. In other words,
apples should be compared with apples.

Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.
1989).
To continue the greengrocer's metaphor, the appellant in
this instance forswore apples and presented the district court with
two persimmons and a pear. Two proffered comparisons involve
situations wholly unlike his own and the third bears a passing
resemblance to his case, but its essence is so different that the
suggested comparison is unreasonable.
In the first comparison case recounted by the appellant,
A, a white male teacher at CRLS, shoved a male student. Although
this conduct seemingly violated a school policy prohibiting the use
of physical force by teachers against students, McGrath gave A only
a written warning. We have no doubt that this conduct was
inappropriate for the scholastic environment but pushing a
student is incomparable to the appellant's behavior in several
relevant aspects.
The improper use of physical force, on one hand, and
sexual harassment, on the other hand, are qualitatively different
infractions. They also create distinct problems in the school
environment and present significantly different possibilities for
remediation. Here, moreover, it is undisputed that McGrath found
A's act to have been taken without premeditated intent, but
believed the uncontradicted evidence that the appellant had acted
deliberately (indeed, the witnesses agreed that he had laughed as
he handed the Application to his student). All things considered,
the two incidents are not sufficiently alike to support a finding
that McGrath acted inconsistently in her handling of them. Seeid.; see also Albert v. Carovano, 851 F.2d 561, 573-74 (2d Cir.
1988) (en banc).
The appellant's second comparison introduces B, a white
female CRLS teacher whom McGrath suspended for five days for
striking a male student and urging him to strike her in return. 
This scenario is similar to that of A, both in that it involved the
use of physical force against a student and in that it bears little
resemblance to the incident that the appellant provoked. Again,
physical touching rather than words were involved, and there were
no sexual overtones. Of course, McGrath deemed B's conduct
deliberate, but this lone similarity is not enough to make the two
cases, in the Dartmouth Review phrase, "fair congeners."
C, a white male teacher and track coach at CRLS, is the
subject of the third attempted comparison. C was accused of
improper conduct with black members of the boys' track team,
including sexual touching and commenting about the size of team
members' private parts. C denied the accusations and other coaches
told McGrath that the alleged touching (patting young men on the
buttocks before a race) was common practice in certain competitive
sports. Faced with conflicting evidence and accounts, McGrath
negotiated a settlement with the teachers' union that placed C on
a one-year unpaid leave of absence from his position as track coach
and required him to attend a seminar on racial sensitivity and
related subjects.
On its facts, this vignette is more like the one that
resulted in the appellant's dismissal but in the end, the analogy
falls short. No valid comparison can be drawn between two
incidents for the purpose of proving disparate treatment if
"differentiating or mitigating circumstances" distinguish either
the employee's conduct or the employer's response to it. Perkins,
78 F.3d at 751. C, unlike the appellant, did not admit to the
misconduct that he was alleged to have committed. His denials cast
a distinct light on his case as one founded on a serious conflict
over background facts. Because C had not conceded that he engaged
in the charged conduct, McGrath had to worry that C might be found
innocent and that proceedings against him might result in no
disciplinary sanction whatever. With these considerations in mind,
McGrath (even though she believed that C had engaged in
inappropriate behavior) reasonably could have decided to negotiate
some discipline, rather than risk his ultimate exoneration by
terminating his employment and precipitating a grievance. No such
possibilities were in play in the instant case, which involved only
a decision on discipline for conduct that admittedly occurred as
reported. We conclude, therefore, that although C's situation is
closer to the appellant's than either A's or B's, the circumstances
vary sufficiently to distinguish McGrath's responses to them.
We summarize succinctly. It is, of course, true that, in
terms of comparative evidence, similarity, rather than
identicality, provides the essential requirement for an analogy. 
Here, however, the exemplars that the appellant touted to the court
below bore too little similarity to the incident in question to
furnish a basis for suspecting racial discrimination. It follows
that the district court did not err in refusing to draw the
exaggerated inferences that the appellant requested. And since the
appellant pinned his hopes of showing pretext and racial animus
squarely on this evidence, its inadequacy compelled the district
court to grant the defendants' motion for summary judgment.
B. The First Amendment.
In addition to his discrimination claims, the appellant
challenged his ouster on the ground that it violated his rights
under the First Amendment (as incorporated against the states
through the Fourteenth Amendment). This claim posited that, in
handing over the Application, the appellant was exercising his
constitutional rights to free speech and expression. Because the
defendants terminated his employment due to that activity, this
thesis runs, his dismissal amounted to a constitutional infraction. 
The district court rejected this construct. See Conward, 1998 WL
151248, at *6-*7. So do we.
In order to establish a prima facie case of a First
Amendment violation in connection with the loss of public
employment, the erstwhile employee must show at a bare minimum both
that he was involved in protected activity and that such activity
constituted a motivating factor in his employer's decision to
discharge him. See Mt. Healthy City Sch. Dist. Bd. of Educ. v.
Doyle, 429 U.S. 274, 287 (1977); Ward v. Hickey, 996 F.2d 448, 452
(1st Cir. 1993). Even though we credit for summary judgment
purposes the appellant's assertion that he did not read the
contents of the Application beyond the title, his claim founders on
the first prong of this paradigm.
The appellant's endeavor to show that his activity 
handing the Application to the student warranted First Amendment
protection encounters two obstacles. The initial problem is that
the First Amendment protects only speech itself and other
expressive conduct that is "inten[ded] to convey a particularized
message" under circumstances in which "the likelihood [i]s great
that the message would be understood by those who view[] it." 
Spence v. Washington, 418 U.S. 405, 410-11 (1974) (per curiam). 
Even if the appellant harbored an intent, as he now says, to
suggest by his transmittal of the Application that swear words were
inapropos for a scholastic environment, it strikes us as highly
unlikely that an adolescent pondering the lascivious questions that
make up the Application would have understood that message.
We need not probe this point too deeply for, even if the
act of handing the document to the student were a type of activity
that could warrant First Amendment protection, the Application's
indecent content permitted its regulation in a high-school setting. 
Let us be perfectly clear: we do not suggest that the Application
is "obscene" in the legal sense (and, thus, lawfully subject to
content-based regulation under the First Amendment). After all, to
determine obscenity, a court must ask "whether to the average
person, applying contemporary community standards, the dominant
theme of the material taken as a whole appeals to prurient
interest." Roth v. United States, 354 U.S. 476, 489 (1957). 
Consistent with the high degree of protection that our Constitution
affords to freedom of speech and expression, this is a purposely
narrow definition. Raw as the Application is, it does not fall
within the cramped confines of legal obscenity.
Yet, the failure of the Application to sink to these
depths does not end the inquiry. What a teacher may impart to his
pupils in a school environment is not determined by reference to
conventional obscenity standards. See Bethel Sch. Dist. No. 403 v.
Fraser, 478 U.S. 675, 682, 684-86 (1986); Keefe v. Geanakos, 418
F.2d 359, 362 (1st Cir. 1969). Although those who work and study
in a school environment do not abandon their First Amendment rights
when they pass through the portals, see Tinker v. Des Moines Indep.
Community Sch. Dist., 393 U.S. 503, 506 (1969), school officials do
have broad discretion to restrict school speech in order to further
educational goals, see Bethel, 478 U.S. at 683-86; Ward, 996 F.2d
at 452. This discretion includes not only the right to design
curricula and select textbooks, but also the right to impose
regulations in order to ensure "that readers or listeners are not
exposed to material that may be inappropriate for their level of
maturity." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271
(1988).
Of course, the relevant legal framework strives to
balance the need for faculty and students to retain expressive
rights against the need for school officials to maintain an
appropriate educational environment. Thus, regulations restricting
classroom speech are constitutional if, and to the extent that,
they are reasonably related to legitimate pedagogical concerns,
provided, however, that those who may choose to speak are given
appropriate notice of what sorts of expressive conduct are out of
bounds. See Ward, 996 F.2d at 452. Keeping scatological documents
away from impressionable youngsters is certainly a reasonable
educational objective. See Bethel, 478 U.S. at 683-86.
The record in this case does not indicate whether the
School Committee specifically proscribed by rule the in-school use
of indecent language. However, the Ward standard does not require
schools to "expressly prohibit every imaginable inappropriate
conduct by teachers;" the standard requires only that teachers be
able reasonably to predict the types of conduct that are
prohibited. Ward, 996 F.2d at 454. We find that the Massachusetts
statute permitting termination of a professional teacher for
"conduct unbecoming a teacher," Mass. Gen. Laws ch. 71, 42,
furnished sufficient notice under this standard that indecent
speech directed to students was impermissible.
That ends this phase of our inquiry. Because the
appellant's conduct was legitimately subject to regulation under
the First Amendment, the district court did not err in granting
brevis disposition on the "freedom of expression" claim.

C. Due Process.
In addition to his substantive claims, the appellant
attacks the process accorded to him. Under state law, a school
board can terminate the employment of tenured teachers only for
certain enumerated causes. See Mass. Gen. Laws ch. 71, 42. Even
so, the School Committee's actions must take into account the
procedural protections afforded by the Due Process Clause of the
Fourteenth Amendment. See Cleveland Bd. of Educ. v. Loudermill,
470 U.S. 532, 541 (1985); Board of Regents v. Roth, 408 U.S. 564,
576-78 (1972).
In the public employment context, the basic requirements
of due process are notice of the charges brought against the job-
holder and an opportunity to respond to them. See Loudermill, 470
U.S. at 546 ("The tenured public employee is entitled to oral or
written notice of the charges against him, an explanation of the
employer's evidence, and an opportunity to present his side of the
story."). In this instance, the appellant received all the process
that was due. At the September 30 meeting, McGrath and the School
Committee's lawyer recounted the charges, showed Conward witness
statements describing the Application incident, and offered him a
chance to tell his version of events.
The appellant argues that this notice came too late to be
constitutionally adequate and that, because he had too little time
to prepare, he was unable meaningfully to respond on the day in
question. Whatever force these plaints otherwise might have had
was dissipated when, before ending his employment, the defendants
extended to him an additional invitation to furnish his version of
relevant events at a pre-termination hearing, see Mass. Gen. Laws
ch. 71, 42D, and the appellant explicitly declined the
invitation. Having waived this golden opportunity to exercise his
due process rights, he cannot now be heard to decry their
deprivation. See Cliff v. Board of Sch. Comm'rs, 42 F.3d 403, 413-
14 (7th Cir. 1994). Because the appellant received the full
procedural panoply that the law prescribes, the district court
appropriately rejected his due process claim.
IV. CONCLUSION
We need go no further. The sanction that McGrath imposed
admittedly is harsh. On this record, however, the appellant is
unable to show, even in the limited way necessary to survive
summary judgment, that racial discrimination, unconstitutionally
suppressed expression, or the withholding of due process cost him
his job. Consequently, we affirm the entry of summary judgment in
the defendants' favor.

Affirmed.