**Mary C. DAVIS, Plaintiff,**

v.

**James N. McCORMICK and Peoria School Dist. No. 150, et al., Defendants.**

Nos. 93–1008, 94–1080.

United States District Court, C.D. Illinois.

Sept. 1, 1995.

Carol J. Hansen, Posegate, Giffin, Winning, Cohen & Bodewes, P.C., Springfield, IL and Michael J. Mannion, Giffin, Winning, Cohen & Bodewes, P.C., Springfield, IL, for plaintiff.

Jeffrey R. Zehe, Mary Nasenbenny and Michael R. Grimm, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, IL, for defendants.

## ORDER

MIHM, Chief Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment on Count I (Case No. 93–1008) and Defendants' Motion for Summary Judgment (Case No. 94–1080). For the reasons set forth below, Defendants' Motion for Summary Judgment on Count I in Case No. 93–1008 is GRANTED and Defendants' Motion for Summary Judgment in Case No. 94–1080 is DENIED.

### FACTUAL BACKGROUND

Mary Davis ("Davis") was hired as a teacher at Peoria Richwoods High School ("Richwoods") in 1985. Between the fall of 1985 and September 27, 1992, Davis was the head coach of the girls' varsity volleyball team at Richwoods. Davis was also the head coach of Richwoods' girls' varsity basketball team between the winter of 1989 and September 27, 1992. At various times between the fall of 1985 and September 27, 1992, Davis coached the freshman/sophomore girls' basketball team, the freshman/sophomore girls' softball team, and the girls' varsity soccer team at Richwoods. On September 28, 1992, Davis was discharged from her duties as the girls' varsity basketball and volleyball coach. Davis filed two cases against Defendants, and the cases have been consolidated for trial. Count I of the Complaint in Case No. 93–1008 alleges that Davis' Fourteenth Amendment Due Process and First Amendment rights were violated when she was terminated from her coaching duties at Richwoods. Count II is a pendent state law claim for breach of contract. In Case No. 94–1080, Davis alleges that her termination from

coaching constituted discrimination based on her sex.

Davis testified that prior to the fall of 1992, she believed that Richwoods' cross-country coach, Bob LaCroix, was actively recruiting students from other programs to join the cross-country team. Davis dep. at 108–09. Ron Eisele, a Richwoods coach for over 20 years, testified that he was also aware of situations where a coach of one sport made efforts to entice a student into switching to another sport and that some students switched sports. Eisele dep. at 26. Leanne Bonifas, Davis' former assistant coach, felt that recruiting was fairly common at Richwoods. Bonifas dep. at 73. Richwoods' Athletic Director, Don Wyss, stated that he received a couple of reports that coaches tried to recruit students from other programs to play on their teams. Wyss dep. at 147. Wyss also testified that in each reported case of recruiting, he talked to the coach and the student, if the student's name was available, and determined that no recruiting occurred. *Id.*

Davis expressed her concerns about recruiting to Wyss on several occasions. Davis dep. at 111. In the spring of 1992, a meeting was held among LaCroix, McCormick, Wyss, and Davis to discuss the fact that a female student had left the volleyball team to join the cross-country team. *Id.* at 111–14. Davis felt that the recruiting issue was not resolved by that meeting. *Id.* at 113.

On September 14, 1992, an article entitled "Working Her Way Up to Speed" appeared in the *Peoria Journal Star* and reported that a student named Currie Robertson had joined the cross-country team after two years on the volleyball team. Robertson also played on the girls' varsity basketball team, which Davis also coached. The article quoted Robertson as stating, "Volleyball didn't seem as fun anymore. It's not my favorite sport. And I didn't want to sit out this season because I want to stay in shape for basketball." In the article, LaCroix denied recruiting from other programs.

After practice on September 14, 1992, Davis discussed the article with her volleyball team in the school gym. Davis dep. at 101–07. Davis testified that she probably discussed several topics, including a summary of the previous practice and maybe preparation for a game that evening, along with article. Davis told her students that she was upset by some of the comments in the article because they "were a slap in the face of the volleyball program and to [her] somewhat as a coach." *Id.* at 105. Davis testified that she had spent a substantial amount of time working with Robertson during her freshman and sophomore years. *Id.* at 106.

The next day, Wyss questioned Davis about the comments she had made to her players during the team meeting the day before. *Id.* at 121–22. Davis recalled Wyss asking her if she had stated, "If Currie Robertson thought she ran a lot last year in basketball, wait until she sees this year." *Id.* at 121. Wyss reported that other coaches were complaining that Davis had said such a statement to her players. Davis denied making such a statement. *Id.* She understood that Wyss' questions related to her September 14 meeting with her volleyball players. *Id.* at 122. Davis testified that Wyss told her that he was "going to get to the bottom of this and maybe we should fire a coach." *Id.* at 121.

After volleyball practice on September 16, 1992, Davis held a team meeting in her classroom at Richwoods. *Id.* at 125. She closed the door to the classroom and considered it a closed meeting. *Id.* at 126–27. Molly Rawls, a Richwoods student and volleyball player who attended the meeting, testified that the windows were also shut. Rawls stmt. at 4. An assistant coach, Eric Flohr, added that Davis closed the doors and windows and inspected the hallway to confirm that no one was present outside the classroom. Flohr stmt. at 3. The volleyball team, Davis, and her assistant coaches, Bonifas and Flohr, attended the meeting. *Id.* Davis discussed how important she felt loyalty was to the success of the team. *Id.* at 128. She also told her players that some male coaches at Richwoods flirted with female players by promising state championships or scholarships that often do not materialize. *Id.* at 128–30, 136–37. Davis denied using the word "flirt" in a sexual context. *Id.* at 137. Davis

used LaCroix as an example of a male coach who promised starting positions to players willing to run on the cross-country team. *Id.* at 129, 137. She also stressed the importance of academics and advised her players to do what made them happy. *Id.* at 129–30. She further cited the fact that other coaches knew what had occurred at the September 14, 1992 meeting to discuss her feeling that what was said at a team meeting should "stay amongst us." *Id.* at 131. At the end of the meeting, Davis handed out t-shirts and forms for selling pies and pizzas. *Id.* at 128.

Rawls testified that this was the first closed meeting held in a classroom that she attended. Rawls stmt. at 5. Rawls had been a member of the volleyball team for at least one previous season. *Id.* Rawls testified that at the meeting Davis was upset. *Id.* Rawls stated:

> I guess the next day the cross country coaches knew about our [September 14, 1992] meeting or whatever and she was really upset that one of our, she was upset that one of her players had went right away and told the coaches, she assumes that one of us did.

*Id.* Rawls further testified that when Davis "found someone had been disloyal and she hollered at us or she got really upset about—she said something about why men shouldn't coach girls athletics because they are liars and all kinds of things." *Id.* at 7. Rawls also remembered Davis stating something to the effect that male coaches take advantage of female students sexually. *Id.*

Assistant Coach Bonifas recalled that the following was said at the September 16, 1992 meeting:

> Mary expressed to the kids that she felt as though there were some, not all ... some male coaches here that promise kids things that aren't realistic. That persuade the girls to do things athletically that they shouldn't be persuaded to do. Quote/unquote, recruiting goes on. And I will be honest in that I think—I believe, and honestly to the best of my memory, that she said some male coaches here flirt with you, you know they flirt with you, and it goes on and you know it goes on, and some of you get tired of it. I don't recall her saying all male coaches. I don't think it was in reference to, quote, males in general. I think there was a direct reference to a few of the males coaches that are on our staff here.

Bonifas stmt. at 7–8. Bonifas testified that Davis told the team that if Davis found out who had leaked information regarding the September 14, 1992 team meeting, that player would be dismissed from the team. *Id.* at 8–9.

Flohr remembers Davis telling the team that she felt very strongly about team loyalty and that "if she found out who the leak was, and she's getting closer, they are gone from my program." Flohr stmt. at 5. Flohr also recalls Davis stating that "men coaches try to take advantage of their athletes, by that it was meant sexually. I don't remember if she said the word 'sexually' or not, but it was implied sexually." *Id.* at 6.

On the morning of September 17, 1992, Flohr gave Davis a letter in an envelope and a brown paper sack and stated, "You may want to talk to me later." *Id.* at 145. In the letter, Flohr stated that he was insulted by Davis' earlier comments that all male coaches promise female athletes that they will become All Americans and that they try to sexually take advantage of female athletes. Flohr returned his team t-shirt and sweat shirt in the brown paper bag. Davis read the letter and sent it to her other assistant coach, Bonifas, to read. *Id.* at 145, 147. Davis planned to talk to Flohr about the letter sometime the next day but never did so. *Id.* at 154. After reading the letter, Bonifas told Davis that she felt the letter did not "say what was said in the meeting." *Id.* at 148. Bonifas felt that Flohr was using the meeting as an excuse to leave the volleyball program because he was very busy teaching in the Richwoods health academy. *Id.*

When McCormick arrived at Richwoods on September 18, 1992, LaCroix was waiting for him and reported that Davis had told her players that male coaches only want to use female athletes sexually. McCormick dep. at 66. LaCroix indicated that Flohr had told him about Davis' alleged comments. *Id.* at 67. McCormick then visited Flohr. Flohr

stated that at the September 16, 1992 meeting, Davis made degrading comments about male coaches and stated that male coaches promised female athletes honors and success. *Id.* at 69. Flohr also stated that Davis had made innuendoes about male coaches' sexual intentions with female athletes. *Id.* Flohr gave McCormick a copy of the resignation letter he had written to Davis. *Id.* at 71.

During the morning of September 18, 1992, Bonifas informed Davis that people were being questioned about her team meeting on September 16, 1992 and the contents of Flohr's resignation letter. Davis dep. at 154–56. Bonifas told Davis that "somebody got a hold of Eric Flohr's letter that he wrote to you and some coaches supposedly are upset." *Id.* at 155.

Shortly thereafter, Davis visited Wyss and asked him what was going on. *Id.* at 157. Wyss responded that he had been instructed by his boss, McCormick, not to discuss the situation with Davis. *Id.* Davis immediately proceeded to McCormick's office and asked him what was happening. *Id.* at 159. McCormick then asked Davis if she had said, "If Currie Robertson thought she ran a lot last year in basketball and wait until this year." Davis denied making that statement. *Id.* McCormick then asked if Davis had called Robertson a traitor. Davis stated she had not. *Id.* McCormick then received a phone call and told Davis he had to go. *Id.* Davis was in McCormick's office for approximately five minutes. *Id.* McCormick did not tell Davis that he was conducting an investigation into what occurred at the September 16 meeting. *Id.* at 168.

During the afternoon of September 18, statements were taken from Bonifas, Flohr, and Molly Rawls. McCormick dep. at 83–89. Before volleyball practice on September 18, Bonifas told Davis that she had been questioned about the team meeting on September 16, 1992. Davis dep. at 162. Bonifas reported that Dr. Pagels, Executive Director of Personnel for Peoria School District 150, Dr. Hines, Associate Superintendent of Peoria School District 150, Julian Cannell, the District's attorney, and a court reporter were present when she gave her statement. *Id.* Bonifas told Davis that Davis was going to be called in by McCormick. *Id.* at 171–72. Bonifas also told Davis that she thought Davis was in "some trouble" and that a strong letter would probably be put in her file. *Id.* at 171.

After the statements were taken from Bonifas, Flohr, and Rawls, Cannell called Davis' union representative, Mike Thomson. Cannell explained that there had been concern that Davis had accused male coaches of having sexual relationships with female athletes. Thomson dep. at 15. Cannell assured Thomson that their investigation revealed that these allegations lacked any substance. *Id.* Thomson then called Davis and left a message requesting that she call him at his home Sunday night. *Id.* at 18.

On the night of September 18, 1992, Davis was selling candy at the Richwoods football game to raise money for the volleyball program when she was approached by Sheila Snarr, a fellow Richwoods teacher. *Id.* at 165. Snarr's daughter played volleyball on Davis' team. *Id.* at 166. Snarr told Davis that male coaches at Richwoods were saying that Davis had told her players that, "All the male coaches want to do is get in the pants of the girls and have sex with them." *Id.* Snarr did not believe Davis had made such a comment. Snarr stated, "If you had said that, Shana would have come home and told us you said that." *Id.* at 167.

Davis spoke with Thomson Sunday night and told him about Flohr's resignation letter, the fact that three persons had been questioned, that she thought she was going to receive a reprimand letter, and that she was supposedly going to be called in for a meeting on Monday with McCormick. *Id.* at 177. At the time she spoke with Thomson, she believed that no disciplinary action had yet been taken. *Id.* at 178. That same night, she talked to an attorney and received legal advice regarding the matter. *Id.* at 179–82.

On September 21, 1992, Thomson met with McCormick, and McCormick showed Thomson the statements of Flohr and Bonifas. McCormick dep. at 111. Thomson scheduled a meeting with McCormick for the next day. *Id.* at 112. During the afternoon of September 22, a meeting occurred among Davis,

McCormick, Wyss, and Thomson. Davis dep. at 189. Prior to the meeting, Davis had not received any further information regarding McCormick's investigation. *Id.* McCormick began the meeting by asking, "What can I help you people with today?" *Id.* at 190. McCormick indicated that he had been approached on September 18, 1992 at 7:00 a.m. by male coaches who were upset by the contents of the Flohr resignation letter. *Id.* at 190–91; McCormick dep. at 66–67. McCormick explained that he had then contacted the attorney for the District, which is his responsibility anytime he becomes aware of allegations of sexual misconduct between teachers and students. *Id.* at 191; McCormick dep. at 78–80. McCormick asked Davis if she had made the statement that Robertson was going to have to run a lot this year during basketball season. Davis dep. at 192. She denied making that statement.

McCormick asked her several times if she had called Robertson a traitor at the team meeting and if Davis had threatened to cut any player who leaked information regarding the team meeting. *Id.* She denied making those statements to her team. *Id.* McCormick also asked her if she had forbidden her students from going home and telling their parents about the team meeting on September 16, 1992. *Id.* at 193. She denied making this comment. *Id.* She understood that McCormick's questions related to her September 16, 1992 team meeting. *Id.* at 194. She cannot recall whether she told McCormick what the purpose of the meeting was or whether she offered information regarding what she had said to her players. *Id.*

Davis testified that McCormick may have asked generally what happened at the September 16, 1992 meeting. *Id.* at 206. She felt that she answered McCormick's questions honestly. *Id.* at 207. McCormick told her that he had the following four courses of action: do nothing, write a letter of reprimand, release her from coaching volleyball, or release her from coaching basketball and volleyball. *Id.* at 193. McCormick indicated that he would let her know his decision by October 1, 1992. *Id.* at 194. When she left the meeting with McCormick, she understood that the discipline options he described were

based on the allegations made by Flohr in his letter and possibly others regarding what she had said at the September 16, 1992 meeting. *Id.* at 208.

After the September 22 meeting, Thomson encouraged Davis to stop by and talk with McCormick because McCormick believed she had lied to him about whether she made certain comments at the September 16 meeting. *Id.* at 212. The next day, September 23, she told McCormick that she had not tried to "blatantly lie" about the team meeting. *Id.* She also admitted that she may have made some "misjudgments" in holding the closed-door meeting. *Id.* at 214–15. She also approached McCormick on September 24, 1992 and told him how much coaching and Richwoods had meant to her the past seven and a half years. *Id.* at 213–14.

On September 28, 1992, Thomson and Davis met with McCormick. *Id.* at 219–20. When Davis entered the office, McCormick presented her with a letter dismissing her from her volleyball and basketball coaching positions at Richwoods and the statements taken during the investigation. *Id.* McCormick stated that her dismissals were effective immediately. *Id.* at 220. The termination letter stated that her conduct at the closed-door meeting was unprofessional and unethical.

On September 29, 1992, McCormick held a conference with student athletes and their parents and stated that there were other reasons why Davis was dismissed but that he was not at liberty to discuss those reasons with the audience. On September 30, 1992, McCormick called her into his office and stated that he knew her coaching programs were based on honesty, integrity, and loyalty but that he dismissed her because he believed she had lied to him about what she said at the September 16 meeting. *Id.* at 228–30.

McCormick testified as follows regarding the reasons he terminated Davis from coaching:

Basically that the total attitude that was borne out in the statements like we just talked about, potential reprisal, degrading and unprofessional discussions with or about male coaches in general, my concern

about loyalty to Richwoods as opposed to loyalty to Mary Davis. Those kinds of things.

One, I put a great deal of trust in the three statements as being accurate. When Mary flat denied those statements, it challenged the trust I had in her as a coach, as a teacher.

McCormick dep. at 195–96. McCormick also explained during his deposition why he removed Davis from both coaching positions:

The process I went through was to weigh the different opportunities of one sport, no sport, two sports. Based on what I had found, which we have talked about, I felt it was inconsistent to remove her from one sport but allow her to keep the other one. Her attitude, unethical behavior, unprofessionalism towards her students about other coaches was not unique to volleyball. It was unique to coaching, whether it be basketball or volleyball or cross-country. It was an attitude that permeated all her activities, not just one.

Id. at 146–47.

## DISCUSSION

Defendants move for summary judgment on Count I of Case No. 93–1008 (procedural due process and First Amendment) and Case No. 94–1080 (Title VII and equal protection). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant's motion for summary judgment must demonstrate, based on the record, an absence of evidence to support the plaintiff's case. Celotex Corp. v. Catrett, 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly sup-

ported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e). The record and all reasonable inferences drawn from it are viewed in the non-movant's favor. Id., 477 U.S. at 253, 106 S.Ct. at 2513.

### Procedural Due Process Claim

■ The Fourteenth Amendment Due Process Clause provides: "No state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Evaluating procedural due process claims is a two-step process. A plaintiff must first establish a protected liberty or property interest. Forbes v. Trigg, 976 F.2d 308, 315 (7th Cir.1992). Defendants' Motion does not argue that Davis did not have a constitutionally protected property interest in continued employment as a coach, and thus, that issue is conceded for purposes of their summary judgment motion. The next question is whether the procedures provided Davis were constitutionally sufficient.

"The essential requirements of due process ... are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985).[1] The Seventh Circuit has explained that at most, the due process clause of the Fourteenth Amendment provides:

[A] state athletic coach the right to know why he is being dismissed and to convince school officials before they dismiss him that they are making a mistake, that their reasons for dismissing him are either not supported by facts or less compelling than they think.

1. Defendants emphasize that the due process required in Loudermill for a tenured public employee was based on concern over the severity of depriving an employee of his livelihood. Loudermill, 470 U.S. at 543, 105 S.Ct. at 1494. Defendants thus conclude that Davis was entitled to less process than was required in Loudermill because her case involves her termination from two discretionary, extra-duty assignments sec-

ondary to her employment as a teacher. Although this issue does not affect the Court's ruling because it finds that the process Davis was afforded met the requirements of Loudermill, the Court is not entirely persuaded by Defendants' argument because Davis derived income from her coaching duties. The termination of her coaching duties clearly affected her livelihood.

*Smith v. Board of Educ. of Urbana School Dist. No. 116,* 708 F.2d 258, 261 (7th Cir. 1983).

■ The undisputed evidence demonstrates that Defendants are entitled to judgment as a matter of law on Davis' claim because she received all the process she was due under the Constitution. Her letter of termination stated:

> Three people who attended that meeting have verified that you not only degraded men coaching women athletic teams, and specifically named Richwoods coaches and implied sexual intentions or misconduct, but that you used methods of intimidation and threats of reprisal towards your players.

She was aware of these charges and had an opportunity to respond to them prior to her discharge from coaching.

On September 18, 1992, Bonifas told Davis that individuals were being questioned about the September 16, 1992 team meeting. Davis dep. at 154–56. Bonifas also reported that she had been questioned with a court reporter present about the September 16 meeting. *Id.* at 162. On September 20, 1992, Davis spoke with Thomson. *Id.* at 177. She acknowledges that she told Thomson that, according to Bonifas, three people had been questioned, and she would likely receive a reprimand letter. *Id.* Thomson had previously discussed the matter and the three statements with Cannell. Thomson dep. at 15–18. Cannell told Thomson that although the allegations of teacher sexual misconduct were unfounded, a problem still existed with Davis' alleged statements at the team meeting. *Id.* at 16. Thomson understood that it "sounded very serious." *Id.* at 17. Thomson talked to Davis on September 21, informed her that he had received a call from Cannell, and advised her about what had occurred up to that point. *Id.* at 20. She indicated that she knew Bonifas had been questioned and she assumed that Flohr and a student had also been questioned. *Id.* at 23.

On September 21, 1992, Thomson was shown Bonifas' and Flohr's statements. Davis, McCormick, and Thomson met on September 22, 1992, before Davis was relieved of her coaching duties. At this same meeting, McCormick told her he had been approached by male coaches who were upset with the allegations in Flohr's resignation letter about what occurred at the September 16 team meeting. Davis dep. at 190–91. Davis received Flohr's letter on the morning of September 17, 1992. *Id.* at 145–46. She admitted being aware of McCormick's concern and responsibilities anytime an allegation of sexual conduct between a teacher and a student existed. *Id.* at 191. McCormick then asked her if she made any statements at the team meeting about retaliating against Robertson during the basketball season or whether she had called Robertson a traitor. McCormick also asked her if she had threatened to dismiss any player from her volleyball team for leaking information discussed at team meetings or had forbidden her students from discussing the team meeting with their parents. McCormick's questions clearly outlined his concerns. Davis was given the opportunity to respond to McCormick's questions and denied making any such statements. *Id.* at 192–93.

At the September 22, 1992 meeting, Davis knew that allegations of sexual misconduct between male coaches and female student athletes concerned McCormick and that the allegations had been investigated. It can also be reasonably concluded that she understood by McCormick's questions that he was troubled by allegations that she had made threats of reprisal toward players for leaking information about team meetings and against Robertson in the form of extra running during the basketball season. She admitted that in answering McCormick's questions at the September 22, 1992 meeting, she told McCormick everything she recalled about the September 16, 1992 team meeting. Davis dep. at 208. Thomson testified that he felt Davis "explained herself fully" and "had said everything that had occurred at the [September 16, 1992] meeting." Thomson dep. at 60. By the conclusion of the September 22, 1992 meeting, Davis understood that any discipline would be the result of what she allegedly said to her players during the September 16, 1992 meeting. She also understood that McCormick would be making the final determination as to what discipline would be im-

posed from the four options he discussed. Davis dep. at 208.

On two occasions after the September 22, 1992 meeting and before she was terminated from her coaching duties, Davis spoke with McCormick. She told McCormick that she had not been untruthful at the September meeting and that she may have made a misjudgment in holding the closed-door team meeting. She also explained how much teaching and coaching at Richwoods meant to her. *Id.* at 212–14.

Davis argues that Defendant McCormick, Wyss, and District 150 administrators failed to provide her notice of the charges against her prior to the September 22 meeting. Davis admits having notice from both Bonifas and Thomson that McCormick was concerned about statements in Flohr's letter before the September 22 meeting. All that due process requires is that she be given notice of the charges against her and an opportunity to be heard prior to the termination of her coaching duties, not prior to her meeting with McCormick. *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495; *Domiano v. Village of River Grove,* 904 F.2d 1142, 1148 (7th Cir. 1990) ("The due process clause requires that prior to the termination of a public employee with a property interest in his employment, the employer must give oral or written notice of the charges against the employee, explain the evidence against the employee, and give the employee an opportunity to present his side of the story to the employer."). Obviously an opportunity to be heard is more meaningful if notice is given before the hearing. In this case, Davis received a meaningful opportunity to respond to the allegations against her. McCormick provided her with notice of the charges at the September 22, 1992 meeting, and Davis told McCormick everything she remembered about the September 16 team meeting. She also spoke with McCormick on two other occasions prior to her dismissal from coaching. The notice and hearing Defendants provided satisfied all that the due process clause requires prior to terminating an athletic coach. She does not claim that after the September 22, 1992 meeting with McCormick, she was unaware of the charges against her.

Davis also argues that it is significant that she did not see the statements of Bonifas, Flohr, and Rawls until after she was given her termination letter on September 28, 1992. She has not cited any case law supporting her claim that due process requires she be given copies of witnesses' statements prior to her termination. A tenured public employee is only entitled to "an explanation of the employer's evidence," not the actual evidence. *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495. Moreover, Thomson, Davis' union representative, read at least the statements of Bonifas and Flohr on September 21, 1992 when he spoke with McCormick on Davis' behalf. Thomson dep. at 47; McCormick dep. at 111–12. Davis discussed the situation with Thomson on September 20, 1992, and he met with her on September 21, 1992 prior to his meeting with McCormick. Thomson also attended the September 22, 1992 meeting with Davis. It can reasonably be inferred from this evidence that She had some knowledge of the contents of the statements prior to her termination from coaching.

Davis also testified that on September 30, 1992, after her termination, McCormick told her she had also been dismissed because she had lied to him. Davis dep. at 228–30. She was on notice of this charge and also had an opportunity to respond prior to her termination. After the September 22, 1992 meeting with McCormick, Thomson advised her that McCormick believed she had lied about what had occurred at the September 16 team meeting. *Id.* at 212. She spoke with McCormick on September 23, 1992 and told him that she had not tried to lie about the September 16 team meeting.

### First Amendment Claim

The First Amendment protects speech by public employees that touch on matters of public concern. *Waters v. Churchill,* — U.S. —, —, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994); *Cliff v. Board of School Com'rs of City of Indianapolis,* 42 F.3d 403, 409 (7th Cir.1994). If the speech addressed a matter of public concern, then the speaker must establish that her interest in expressing herself is "not out-

weighed by any injury the speech could cause to the interest of the States, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Tp. High Sch. Dist. 205*, 391 U.S. 563, 566–70, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). Whether Davis' speech to her team during the September 16, 1992 meeting addressed a matter of public concern is determined by considering the content, form, and context of her statements. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Her personal motive is also relevant, but "the fact that an employee speaks at least in part for personal reasons will not automatically deprive her statements of the protections afforded to speech on a matter of public concern." *Cliff*, 42 F.3d at 410.

■ To establish that her comments to her volleyball team were a matter of public concern, Davis emphasizes that she teaches at a public high school, was a public high school coach, met with her team in a public classroom, and addressed a group of public school athletes. These facts are not determinative of whether speech addresses a matter of public concern. Otherwise, all speech by a public school teacher or coach in the school to her students or players would be protected by the First Amendment, and this is not the law.

She contends that the content of her speech concerned public issues. She claims that she discussed fundraising with her players on September 16, 1992 and that this is a matter of concern. Davis also claims that her speech at the September 14, 1992 meeting involved the day's team practice and team loyalty. The discussion of the mundane aspects of fundraising, the day's team practice, and team loyalty do not involve matters of public concern. Moreover, this speech is not relevant because she has presented no evidence which indicates that she was disciplined and dismissed from her coaching duties for discussing fundraising, team practice, or team loyalty.

Davis also argues that her discussion of recruiting by male coaches is a matter of public concern because it was mentioned in the article in the *Peoria Journal Star*. She claims that it is important for athletes to realize that promises by coaches do not always materialize and "all that glitters is not gold." Davis' Memo. at 18. Although the issue of recruiting may be of interest to the public and specifically to parents of Richwoods' students, the "precise content, form, and context" of Davis' speech concerning recruiting by male coaches of female athletes shows that her speech addressed private, not public concerns. *Id.*

Viewing the facts in the light most favorable to Davis, it cannot reasonably be inferred that she was attempting to call public attention to the issue of recruiting in high school athletics. On September 14, 1992, she told her volleyball team that she was "upset" about the article in the *Peoria Journal Star*. Davis dep. at 105. She found some of the comments in the article personally insulting to her as a coach and her volleyball program. *Id.* She was hurt by Robertson's decision to join the cross-country team because she had invested a substantial amount of time working with Robertson. *Id.* at 106. The statements by Davis at the September 14, 1992 meeting concerned the effect that recruiting had on her program and how it hurt her feelings to lose Robertson.

She next held a closed-door meeting in her classroom with only her players and two assistant coaches. She emphasized the importance of loyalty and told her players that male coaches often make promises that do not materialize. *Id.* at 128. Team loyalty is not a matter of public concern. Bonifas remembers Davis stating that male coaches make unrealistic promises to entice female athletes to join their teams. Bonifas stmt. at 7–8. Rawls testified that Davis was very upset that one of her players had discussed the volleyball team meeting on September 14, 1992 with other coaches. Rawls stmt. at 5, 7. Davis admits stressing the importance of discussions at team meetings staying "amongst us." Davis dep. at 131. Her discussion of team loyalty and emphasis on keeping team meeting discussions among team members indicates that she did not want her comments publicized. She was concerned about the effect recruiting had on her program and her feelings. Her comments

were on her own behalf. She did not ask her assistant coaches to comment on the issue of recruiting or hold a discussion with her players.

Both Rawls and Flohr recall Davis implying that male coaches attempt to sexually take advantage of female athletes. Rawls stmt. at 7; Flohr stmt. at 6. Clearly an allegation by Davis that male coaches have engaged in sexual misconduct with female student athletes would be a matter of public concern, but she denies making any such allegation or using the word "flirt" in a sexual context. Davis dep. at 137; 204.

### Title VII and Equal Protection Claims

■ Davis also alleges that she was discharged from her coaching duties at Richwoods because of her sex. Title VII makes it unlawful "for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." Davis has not presented any direct evidence of sex discrimination. Thus, she must proceed under the *McDonnell Douglas* burden-shifting analysis. Davis must establish her *prima facie* case by demonstrating that: (1) she belongs to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated similarly-situated male employees more favorably. *Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir.1994); *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1132 (7th Cir.1994). If she establishes a *prima facie* case of discrimination, the burden then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for terminating Davis as a coach. *Hughes,* 20 F.3d at 746; *Lenoir,* 13 F.3d at 1133. Davis may challenge Defendants' explanation by showing that the stated reasons are a pretext for sex discrimination. *Id.* She may establish a pretext by proving that: (1) Defendants' explanation has no basis in fact; or (2) Defendants' explanation was not the real reason; or (3) at least the stated reason was insuffi-

cient to warrant her termination from coaching. *Lenoir,* 13 F.3d at 1133.

■ To establish a violation of the equal protection clause, Davis must establish elements similar to those of Title VII. She must show that she is a member of a protected class, is otherwise similarly situated to members of the unprotected class, and was treated differently from members of the unprotected class. *Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir.1990). She must also show that Defendants acted with discriminatory intent to establish a violation of the equal protection clause. *Id.* at 538–59.

■ For purposes of summary judgment, Defendants assume that Davis establishes the first three *prima facie* elements. The main issue disputed by the parties is whether she was treated differently than male coaches, which is also related to whether Defendants' reasons for terminating her from her coaching duties were a pretext for sex discrimination.

The Court has carefully reviewed the Defendants' treatment of Larry Jenkins, Ron Eisele, Ralph Gallo, and Bret Zahner and concludes that there is a dispute of material fact as to whether similarly situated male coaches were treated more favorably than she was treated. This evidence also arguably raises a reasonable inference that Davis' termination from all coaching duties was a pretext for intentional sex discrimination. Davis' discipline was arguably more severe than any male coach's discipline.

Zahner was allegedly involved in three incidents of misconduct. One incident involved an allegation that Zahner had discussed his sex life with students and showed copies of *Playboy Magazine* to them.[2] Zahner denied the allegations, and no investigation or discipline occurred. He was not removed or suspended from any coaching position. Jenkins admitted making derogatory comments about Richwoods' cheerleaders and a fellow teacher and informed his students that he once dated a stripper from "Big Al's." Jenkins made a

---

2. Zahner also admitted calling a student a "son of a bitch" and stating to a student on Davis' basketball team, "Does your new assistant coach date? We know your head coach doesn't." Zah-

ner received a "severe tongue lashing" for calling a student a "son of a bitch" and a one-season suspension from his paid extra-duty ticket taking assignment for the comment about Davis.

minimum of three unethical comments and only received a letter of reprimand, and the letter of reprimand makes no reference to some of the more blatantly improper language (e.g., dating a stripper from "Big Al's").

Eisele admitting grabbing his crotch and giving the crowd the finger at a basketball game. He was suspended for the rest of the basketball season, which amounted to approximately four weeks, and was allowed to return to coaching basketball the following season. Eisele also told Wyss in a loud voice at a game that the Director of Transportation at Richwoods was incompetent when a bus failed to show up to transport one of Eisele's teams to a tournament. Eisele was suspended from coaching basketball for the remainder of the season. Gallo was suspended from coaching sophomore basketball for one season for using strong profanity when addressing his team and, specifically, one student.

Prior to the allegations concerning Davis' September 16 team meeting, she was not reprimanded or disciplined by Richwoods. She denied accusing male coaches of sexual misconduct with female athletes, threatening players with retaliation or reprisals, and calling Robertson a traitor. Bonifas, Flohr, and Rawls had their statements taken with Pagels, Hines, Cannell, and a court reporter present. Pagels and Hines were never called to Richwoods on any situation other than the Davis case regarding an allegation of misconduct by a coach. Pagels and Hines testified that Davis' case was the first time sworn statements were taken regarding a coaching disciplinary matter. Davis was relieved of all of her coaching duties on September 28, 1992 and has not coached at Richwoods since that time. In contrast to Davis' discipline, Eisele's suspensions and Zahner's suspension from ticket taking did not affect any of their other coaching duties. Eisele was only suspended for a season after each incident. Davis claims that she was permanently terminated from all coaching duties at Richwoods. Defendants claim that Davis was not permanently terminated from coaching, but she has not been offered a coaching position since her termination. Moreover, Eisele was not asked to return his keys used during coaching while he was suspended, but Davis was repeatedly told by McCormick to return all keys relating to coaching duties.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment on Count I in Case No. 93–1008 is GRANTED and Defendants' Motion for Summary Judgment in Case No. 94–1080 is DENIED.