IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2016 Session

## PAUL M. MARTIN v. PERMA-CHINK SYSTEMS, INC.

**Appeal from the Circuit Court for Knox County**
**No. 330713      Deborah C. Stevens, Judge**

---

**No. E2015-01466-COA-R3-CV-FILED-JUNE 27, 2016**

---

This appeal arises from an age discrimination lawsuit brought under the Tennessee Human Rights Act ("THRA"). Paul M. Martin ("Martin") sued his former employer Perma-Chink Systems, Inc. ("Perma-Chink") in the Circuit Court for Knox County ("the Trial Court"). Martin alleged that he had been fired as a sales representative for Perma-Chink because of his age, then 60. The matter was tried before a jury, which returned a verdict in favor of Martin. Perma-Chink filed an appeal to this Court, and Martin raises his own issues on appeal. Perma-Chink argues, among other things, that the Trial Court erred in admitting a chart ("the Chart") containing raw data of employee ages at their date of termination, and that Martin failed to prove a prima facie case of age discrimination. We, *inter alia*, affirm the age discrimination judgment for Martin. However, we find error in the calculation of damages for back pay in that Martin's post-termination earnings were not taken into account, and we remand for the Trial Court to enter a remittitur in the amount of $20,219.05. Should Martin refuse this remittitur, Martin may opt for a new trial. We find further that under the THRA Martin is entitled to an award of attorney's fees and litigation expenses incurred on appeal, and we remand for the Trial Court to determine a reasonable award of attorney's fees and litigation expenses for Martin. The judgment of the Trial Court is affirmed as modified.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Robert R. Carl and Ashley Meredith Lowe, Knoxville, Tennessee, for the appellant, Perma-Chink Systems, Inc.

Richard T. Scrugham, Jr., Knoxville, Tennessee, for the appellee, Paul M. Martin.

# OPINION

## Background

In June 2013, Martin sued Perma-Chink in the Trial Court under the THRA alleging age discrimination in his termination. Perma-Chink is a business that manufactures flexible chinking and preservation products for log homes. Martin was 56 when he was hired by Perma-Chink to be a sales representative. He was 60 when he was fired. Perma-Chink filed an answer in opposition. Perma-Chink also filed a motion for summary judgment, which was denied. This case was tried before a jury in February 2015.

Martin, age 62 at trial, testified. In May 2008, Martin, then age 56, was hired by Perma-Chink as an outside sales representative. Martin had spent decades in sales before taking this new job. Martin described his job at Perma-Chink: "Outside salespeople, we were actually given a car, and that was to try to do a lot of traveling. We actually called face-to-face on the customer and would go out to job sites where log homes were being built and just things like that. We had contact." Martin originally was assigned a massive territory encompassing Arkansas, Kansas, Oklahoma, Louisiana and Texas. In 2009, Tennessee was added to Martin's territory.

Martin testified as to the leadership at Perma-Chink. Rick Webb ("Webb"), then national sales manager, was his direct supervisor. Webb in turn reported to a "management team," consisting of Terry Hofrichter, Tony Huddleston, and Randy Adamson. Huddleston and Martin were based in Knoxville. Adamson and Hofrichter were based in Redmond, Washington. Perma-Chink's owner, Rich Dunstan, was based in Redmond, as well. According to Martin, Adamson actually ran the company, and he was fixated on cutting costs by all means.

Martin described his feelings about his job: "Perma-Chink was a great company to work for. I enjoyed my job. The customers were easy to call on, they were great guys, and so I had no trouble doing the extra." Martin testified to his sales style:

My style is more of a personal selling style. I'm not a high-pressure kind of guy. I go out and develop a relationship with a customer, get to kind of know them, get to kind of know their needs, and then will kind of develop the honesty and their trust in me.

And then at that point I feel that I can go out and, you know, try to sell them and gradually work products into the -- into the mix of things. And it's just worked very good for me.

Martin testified that he received an "A" rating in 2012 from Webb.

However, problems began to develop for Martin. In August 2012, Perma-Chink instituted a new training program called Sandler for its outside sales staff. The parties at trial and on appeal dispute the degree to which Martin resisted learning the new sales system and whether his effectiveness declined. Martin testified to issues surrounding Sandler, as well as his performance at Perma-Chink around this time, as follows:

Q. All right. It says "The plaintiff's supervisors, including Mr. Huddleston and Mr. Webb, have attempted to work with the plaintiff to improve his performance with respect to planning, expense management, and sales skills, among other things." How do you respond to that?

A. Well, I had a talk with Tony. Tony Huddleston is kind of a – he's a very laid-back guy. He's a great guy. But he's the kind of guy that if you want to find Tony, you're probably going to find him in the warehouse drinking a cup of coffee and smoking a cigarette. That's just Tony's style. Everybody likes Tony because he's laid back, he's not demanding. Like I said, he's a great guy.

So when this says this makes you think that we had a meeting, well, it wasn't that way. You kind of walk up to Tony if I was picking up some product and say, "Hey, Tony, how are you doing?" and Tony would be sitting there, and we all kidded around with each other.

And so this thing here was that this never happened. They didn't attempt to work with me because the person that would have worked with me would have been Rick. And Rick never worried about it. He didn't take it serious. I even asked him about one time about the different aspects of this system, and he said "I don't know. It's just something that management has come up with."

So there was no attempt to work with me on managing my performance to plan, with the exception of saying, "You need to plan better."

I talked to Tony about planning, because I didn't put a lot of detail in my calls. I would write down, "Went down to Satterwhite Sales, met with Blake or Sam Satterwhite, the owner. We talked about screws, whatever."

-3-

And I said, "Well, what do you want me to say?" and Tony's actual response was, "You need to learn to lie better. You need to learn to just put things on there and satisfy Randy's curiosity or demand for detail."

Martin acknowledged that his sales declined, but stated that was because of certain factors beyond his control. Martin also denied that he had been uncooperative regarding the new sales system. In mid-2012, Martin began to suffer medical issues, some related to his back. As to Perma-Chink's expressions of concern about his performance, Martin testified:

Q. They didn't mention planning until 2012?
A. Basically, it was "You need to plan better. Randy is looking at your reports, and we need to get more detail."
Q. You can remember that happening once?
A. Yes.
Q. No sit-down meeting, no formal disciplinary, "You need to get better at that?"
A. Absolutely not. The meeting with Tony was standing at the warehouse while he was drinking a cup of coffee. And we would say things back and forth, just like general talk.
Q. You never heard the "P" word, "probation?"
A. Absolutely not. That would have devastated me, because I loved my job and I did the best I could do. If Rick would have said "probation" I would have been devastated, because he told me that I was doing everything good.
Q. If Rick comes into court and says he told you you were on probation, how would you respond?
A. That's a lie. That's not true.

Martin was fired in December 2012. Webb delivered the news to Martin at a meeting at a McDonald's restaurant. Webb told Martin that the company had decided to go in a different direction. An existing outside sales representative, Paul Peebles, took over Martin's territory. Martin, meanwhile, began to earn additional income from a nut roasting business he had opened while still at Perma-Chink.

Martin testified as to why he believed age was the reason for his termination:

Because when you look back at all the -- my four and-a-half years, I had nothing but good reviews. I was given the third year I was there, I believe it was, I was given the largest pay raise of all the salespeople. They gave me the territory, they entrusted me with the most important territory

-4-

that the company had at the time. And that I had had nothing but good reviews and positive feedback.

There was no reason whatsoever, any, that I had done anything wrong -- and that came directly from my boss, Rick Webb -- to be fired. And so -- but during the time I was starting to deal with some medical problems, and of course that was going to be -- you know, with your age, you don't get -- lots of times you don't get healthier, you have future more problems as you get older. And I just think at the time that I went from being an asset to a liability.

And even with Rick Webb, because he kept telling me, "I don't know why they did this." It just makes me think that I was the second-to-oldest salesperson with a very large territory, and so I think it had to have something to do with my age.

Martin acknowledged that Huddleston, who had hired him and also later had a role in his termination, was older than him.

Adamson, Perma-Chink's corporate controller, testified. The Chart was introduced at this point. The Chart had been prepared by Perma-Chink in response to Martin's interrogatories and was admitted as Exhibit 30. The Chart revealed that during the period Martin worked for Perma-Chink, eight outside sales people were fired by Perma-Chink. Four of the eight were 60 years old or above. The Chart's relevance and admissibility is a central issue on appeal.

Adamson testified to the decision to terminate Martin:

Q. When was the actual decision made to terminate Mr. Martin?
A. As I look back now, the actual decision was made early November of 2012.
Q. But you all had been discussing it for months; is that right?
A. Over a lot of the previous months, back at least to February of 2012, when he was placed as number three, the possible being laid off when we downsized. But the actual decision itself was finally made on November -- the first week of November.
Q. What were the reasons that Mr. Martin was terminated?
A. The biggest single reason was his lack of effectiveness at growing his sales territory. And that's the biggest reason, despite all the lack of effort and the great rapport and the relationships he was able to build with his

customers. But at the end of the day, a salesperson's got to sell and grow their sales to keep their job.

And it's such a large and intense and important territory for Perma-Chink as a whole. This is where we started. It is still kind of our biggest and most historic territory for all of our legacy accounts, the manufacturers.

And to see what had happened to his sales numbers, declining year after year after year, when for a year or two all the other territories kind of did that because of the economy and the natural things you would expect. But then when the other territories started really getting back to double-digit growth and Mr. Martin's territory still had either small gains, small losses; very flat, though, for such a big territory, which was now down to about half the size of what it was before we hired him and expanded to this large sales team.

So that was very much a concern to us, such an important territory to be not -- he was trying so hard, but really not -- at the end of the day, not being effective in leading all those relationships and friendships and everything to have it equate to growing sales.

Adamson testified that age played no factor in Martin's termination.

Webb, Martin's direct supervisor, testified. Webb testified regarding Martin's performance evaluations and, later, his overall critique of Martin's performance as a sales representative, including his alleged tendency to plan poorly for appointments:

Q. Okay. All right. So you said "He has many strengths in regard to his position with Perma-Chink." Right? You're admitting that he has many strengths?
A. Sure.
Q. "He excels in work ethic and attitude. Outstanding at rapport building." You're talking about relationship-building with clients. He's good with people?
A. That's part of it, yes.
Q. All right. "As Paul and I have discussed in a meeting, he's being asked to improve on appointments, customer planning." What do you mean by that?
A. Just simply making appointments, planning your trips. Have a reason to go where you're going. Have a reason, and then use the next step. So it all has to do basically with planning and appointments.

***

Q. Mr. Webb, I want to ask you about an email you sent in this chain. Can you see there on April 18th, 2011, there in the middle of the screen, is there an email from you to the management team and the owner, Rich Dunstan?
A. Yes, it is.
Q. Okay. Does that reflect that you spoke with Paul about concerns related to his lack of planning and, you know, not -- not seeing the right people on his trip to Kansas?
A. Yes, this -- I think this came about from -- I know Paul and I had talked. He was either in Kansas or it -- it may have been the previous week. And I know at that time he was talking to a particular customer about going back out -- back out to Kansas and do like a workshop seminar for customers that come in.

And I think the whole trip was really wrapped around going to see this one customer. And I know at the time I told him, "Paul, you realize that customer has done less than $200 in two years?" And I think he seemed to be surprised at that.

So, you know, again, we talked about, "This is the reason you plan, this is reason you have a reason to be going where you're going. And do some -- you know, do some appointments and planning."

Webb testified that age played no role in Martin's termination. The Trial Court denied a motion by Perma-Chink for directed verdict at the close of Martin's proof.

Huddleston, Perma-Chink's East Coast General Manager, testified. Huddleston's testimony was in support of the other Perma-Chink management team. In 2012, concerns arose with management about Martin's performance. Again, the issue revolved mainly around Martin's allegedly failing to plan ahead properly for appointments. Huddleston testified that he spoke to Martin about these concerns. At the end of the trial, Perma-Chink renewed its motion for directed verdict, which also was denied.

In February 2015, the jury returned a verdict in favor of Martin in the amount of $132,040 in damages. Martin filed motions for an award of front pay, attorney's fees and costs, and prejudgment interest. In March 2015, Perma-Chink filed a motion for directed verdict, or, for a new trial, or, in the alternative, for a remittitur. Specifically, Perma-Chink sought a remittitur based on a requested reassessment of

Martin's base pay calculation and an accounting for his income from the nut roasting business after his termination from Perma-Chink. In July 2015, the Trial Court entered an order denying Perma-Chink's motions, and granting only Martin's motion for attorney's fees and costs in the total amount of $136,320.33. The Trial Court approved the jury's verdict. Perma-Chink filed an appeal to this Court.

## Discussion

Although not stated exactly as such, Perma-Chink raises the following issues on appeal: 1) whether the Trial Court erred in admitting the Chart; 2) whether the Trial Court erred in denying Perma-Chink's motion for directed verdict; 3) whether the Trial Court erred in denying Perma-Chink's motion for a new trial; and, 4) whether the Trial Court erred in denying Perma-Chink's motion for a remittitur. Martin raises the following separate issues on appeal: 1) whether the Trial Court erred in denying Martin's supplemental motion for attorney's fees; 2) whether the Trial Court erred in denying Martin's motion for prejudgment interest; and, 3) whether Martin should be granted his attorney's fees and litigation expenses incurred on appeal.

As our Supreme Court has instructed:

An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

This Court has discussed the standard in THRA cases as follows:

The Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101 *et seq.*, prohibits employers from discriminating against their employees who are forty years old or older because of their age. Tenn. Code Ann. § 4-21-101(a)(3), (b). The THRA specifically prohibits age discrimination in hiring, firing, fixing compensation, or defining the terms and conditions of employment. Tenn. Code Ann. § 4-21-401(a)(1), (2), *Wilson v. Rubin*, 104 S.W.3d 39, 51 (Tenn. Ct. App. 2002). An employee seeking to recover for unlawful age discrimination bears the ultimate burden of proving that considerations of age not only played a role in but determinatively influenced the employer's decision. *Wilson* at 51-52 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993); *Loeffler v. Kjellgren*, 884 S.W.2d 463, 469 (Tenn. Ct. App. 1994); *Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984)). To establish a *prima facie* case of age discrimination using the indirect method of proof, an employee who has been terminated must demonstrate (1) that he or she is a member of the protected class of persons forty years of age or older, (2) that his or her work performance satisfied the employer's reasonable expectations, (3) that he or she was actually or constructively terminated, and (4) that the termination occurred under circumstances giving rise to an inference of discrimination based on age. *Wilson* at 52 (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). Proof that the plaintiff was replaced by a substantially younger employee may be shown to establish the fourth element. *Id.* (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-12, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)).

*Williams v. Greater Chattanooga Public Television Corp.*, 349 S.W.3d 501, 509-10 (Tenn. Ct. App. 2011).

In addition, this Court has further explained:

As this court stated in *Wilson*, an employee may demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. *Wilson*, 104 S.W.3d at 50-51 (citing *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)). Of the three most common ways to undermine an employer's proffered reasons, one is establishing that the proffered reasons have no basis in fact. *Wilson*, 104

S.W.3d at 50-51 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *Cliff v. Bd. of Sch. Comm'rs.*, 42 F.3d 403, 412 (7th Cir. 1994); *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993); *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d at 708). Proof that an employer's explanation is unworthy of credence is a persuasive way to prove unlawful discrimination. *Wilson*, 104 S.W.3d at 51; *see also Reeves*, 530 U.S. at 147-48, 120 S.Ct. 2097.

*Frame v. Davidson Transit Organization*, 194 S.W.3d 429, 438-39 (Tenn. Ct. App. 2005).

We first address whether the Trial Court erred in admitting the Chart. "The appellate court affords the trial court wide discretion regarding the admissibility of evidence and will not overturn the trial court's determination absent an abuse of that discretion." *Goodale v. Langenberg*, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007).

As pertinent to this issue, Tenn. R. Evid. 401 provides:

Rule 401. Definition of "relevant evidence."—"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides:

Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.—Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. As this Court noted in *Goodale*:

Additionally, we have observed that the plain language of the rules "strongly suggests" that when the balance between the evidence's probative value and any prejudicial effect is close, the evidence should be admitted. *Id.* at 21 (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 403.3, at 152 (3d ed. 1995)). Therefore, excluding relevant evidence under rule 403 "is an extraordinary step that should be used sparingly." *Id.*

*Goodale*, 243 S.W.3d at 587.

Regarding statistical evidence, which Martin purports the Chart is, we have stated:

As the court in *Simpson v. Midland-Ross* noted: "statistical evidence ... does not differ greatly from other types of proof." *Simpson*, 823 F.2d at 944. This evidence is relevant only when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn.R.Evid. 401. *Simpson* further directed that:

Statistics gain relevance in one of two ways: the statistics, standing alone, reasonably lead to a particular conclusion validated by human experience, or comparative statistics point out discrepancies in behavior that would cause the average person to scrutinize the employer's motives. Unless the statistics, standing alone or in comparison, are sufficient to lead the mind naturally to the conclusion sought, the[y] have no probative value; they do not move the proof one way or another. "In short, their usefulness depends on all of the surrounding facts and circumstances."

*Simpson*, 823 F.2d at 944 (quoting *Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977)).

*Brenner v. Textron Aerostructures, a Div. of Textron, Inc.*, 874 S.W.2d 579, 587 (Tenn. Ct. App. 1993).

Perma-Chink argues that the Chart's prejudicial impact outweighed any probative value. According to Perma-Chink, the Chart's raw data reflecting that certain employees over age 60 were terminated proves nothing at all regarding any alleged age bias. Perma-Chink cites the United States Court of Appeals, Sixth Circuit case of *Wilkins v. Eaton Corp.*, 790 F.2d 515, 523 (6th Cir. 1986) wherein the court stated regarding a graph introduced by plaintiff:

[T]he graph prepared by Wilkins does not help him in reaching his ultimate production and persuasion burdens. The graph shows that the average age of pilots decreased during a certain period of time, but the graph completely lacks specificity. For instance, the decrease in age could have resulted because several pilots retired or voluntarily transferred to non-flying

-11-

positions, requiring younger pilots to be hired. Although the graph arguably supports an inference of discrimination when establishing a prima facie case, it is insufficient circumstantial evidence to support the jury verdict in this case. Even when combined with the other pieces of evidence offered by the plaintiff, the result is a mere scintilla of evidence from which no rational jury could have found a violation of the ADEA.

Perma-Chink asserts that it proved at trial that it had legitimate, non-discriminatory reasons for terminating Martin, including: his declining sales, resistance to training, and failure to properly plan for appointments. Martin had the burden to make out a prima facie case and rebut Perma-Chink's assertion of a legitimate business reason to fire him. The crux of this case, then, is whether Martin put on material evidence such that the jury could conclude that Perma-Chink's stated reason for firing him was pretextual, and that in fact, he was impermissibly fired on account of his age.

We begin by observing that evidence which is prejudicial obviously is not necessarily inadmissible on that basis alone. Probative evidence almost always will harm the other party's case, and its entry nevertheless is perfectly appropriate. In fact, that harm to the other party's case likely is why it was offered in the first place. In the instant case, the allegation was age discrimination. It strikes us as natural that the plaintiff would seek to introduce evidence produced and prepared by the employer regarding the employer's record when it comes to its practices toward older workers. Perma-Chink was free to make whatever arguments it deemed proper in rebuttal to the Chart's implications, and it did so.

Moreover, the Chart, with its raw data, was not the sole evidentiary or argumentative basis for Martin's proof. If it were, perhaps Perma-Chink would have a stronger argument. However, Martin's argument went beyond the Chart. Martin testified that he was a good sales representative who was fired under mysterious circumstances, that this occurred as he began to experience health problems, and that the de facto leader of the company wanted to cut costs at all costs. Perma-Chink, in response, presented its case for why its termination of the 60-year-old Martin was based on legitimate business reasons and had nothing to do with his age. The jury heard the evidence, weighed it, made credibility determinations, and rendered its verdict in favor of Martin. We note also that the Chart was prepared by Perma-Chink in answer to interrogatories submitted to Perma-Chink.

In sum, Martin's case did not rely exclusively on the Chart. The Chart was one piece of circumstantial evidence Martin produced to prove age discrimination. Tennessee law does not require direct evidence of age discrimination, and such evidence is quite rare in these type cases. The Trial Court exercised its discretion in allowing the

Chart to be introduced as an Exhibit, and we find no abuse of that discretion. We hold that the Trial Court did not err in admitting the Chart.

We next address whether the Trial Court erred in denying Perma-Chink's motion for directed verdict. Our Supreme Court discussed the standard under which an appellate court must review a motion for a directed verdict in *Johnson v. Tennessee Farmers Mut. Ins. Co.*, stating:

> In reviewing the trial court's decision to deny a motion for a directed verdict, an appellate court must take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). A motion for a directed verdict should not be granted unless reasonable minds could reach only one conclusion from the evidence. *Id.* The standard of review applicable to a motion for a directed verdict does not permit an appellate court to weigh the evidence. *Cecil v. Hardin*, 575 S.W.2d 268, 270 (Tenn. 1978). Moreover, in reviewing the trial court's denial of a motion for a directed verdict, an appellate court must not evaluate the credibility of witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Accordingly, if material evidence is in dispute or doubt exists as to the conclusions to be drawn from that evidence, the motion must be denied. *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995).

*Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006).

Our standard of review is exacting, as described above, on motions for directed verdict. There were numerous factual disputes in this case, with both sides presenting evidence for their claims. The Trial Court was obliged to take "the strongest legitimate view of the evidence" in favor of Martin as the non-moving party in deciding this motion. As discussed more fully above, the crux of the case was whether Martin presented material evidence from which a jury could find that Perma-Chink's stated reason for firing him was pretextual, and that, their right otherwise to dismiss an employee at will was not implicated. We conclude that Martin produced sufficient circumstantial evidence from which the jury could reach the finding that it did. We affirm the Trial Court in its declining to grant Perma-Chink's motion for a directed verdict.

We next address whether the Trial Court erred in denying Perma-Chink's motion for a new trial. With regard to a motion for new trial, this Court has explained:

A trial court is given wide latitude in granting a motion for a new trial, and a reviewing court will not overturn such a decision unless there has been an abuse of discretion. *Mize v. Skeen*, 63 Tenn. App. 37, 42-43, 468 S.W.2d 733, 736 (1971); *see also Tennessee Asphalt Co. v. Purcell Enter.*, 631 S.W.2d 439, 442 (Tenn. App. 1982). As the thirteenth juror, the trial judge is required to approve or disapprove the verdict, to independently weigh the evidence, and to determine whether the evidence preponderates in favor of or against the jury verdict. *Mize*, 63 Tenn. App. at 42, 468 S.W.2d at 736. If the trial judge is dissatisfied with the verdict, he should set it aside and grant a new trial. *Hatcher v. Dickman*, 700 S.W.2d 898, 899 (Tenn. App. 1985) (quoting *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 469, 79 S.W. 803, 804 (1904)).

*Loeffler v. Kjellgren*, 884 S.W.2d 463, 468-69 (Tenn. Ct. App. 1994).

Here, Perma-Chink cites to two statements made by the Trial Court which allegedly suggest that the Trial Court based its rulings on evidence not contained in the record. First, the Trial Court, after having ruled that Martin could not explore alleged inconsistences from Perma-Chink in their explanations regarding the termination of former employees, stated the following as it denied Perma-Chink's motion for a directed verdict:

Well, I think it's a very difficult case. I'm not sure that the raw data provides us any basis from which we can conclude discrimination. However, I think Mr. Scrugham's argument that you've got people who were terminated at a certain age and that you've got inconsistencies about the reasons for termination, given the directed verdict standard, I'm going to allow it to proceed to trial and let you put your proof on.

First, it is inconclusive whether the Trial Court's statement concerning "inconsistencies" refers to the specific subject matter the Trial Court previously had ruled was not to be explored. Second, we do not believe this statement rises to a showing abuse of discretion in denying Perma-Chink's motion for a new trial.

Second, Perma-Chink points out a statement the Trial Court made at the end of the trial whereby the Trial Court appeared to have misgivings about the strength of Martin's case. The Trial Court stated:

THE COURT: And I clearly understand how tough a burden it is to get a directed verdict motion. I'm just concerned that what it boils down to is

-14-

that you've got evidence that four out of seven, or whatever that number is that you wanted to argue, is basis for showing that there's a pattern.

MR. SCRUGHAM: We say that that's part of our circumstantial evidence; yes, your Honor.

THE COURT:      All right. And that it's not countervailing evidence, it's just additional facts; which is that's four out of those seven people, but we've had at least three people here testify that they are over the age of 60 and still employed by Perma-Chink.

So, you know, it's not countervailing evidence, it is I'm just not sure how we get to the statistical evidence, and then I'm not sure how we get to the health care as being anything other than a general misstatement about the issues related to questions that you would anticipate that an employer would generally ask their employees. Like, "Please, you know, do what you can to take care of yourself to keep our health care costs down." Similar to "When do you intend to retire, or what do you intend to do with your retirement benefit plans?"

If we can't ask those questions and they become a basis for creating an age discrimination case, then it seems to me you're creating, de facto, every person who is over the age of 60 who works for a company that has health insurance is going to, by definition, be guilty of age discrimination, because under your theory everyone who ages becomes more expensive. I don't know that that's correct, but that seems to be what you're arguing.

\*\*\*

And I'm going to deny the motion for directed verdict. I'm just telling you that I'm very concerned that while I agree with you that in most employment discrimination cases you are going to have to connect dots to get to an age discrimination case, it seems to me what you're asking under the facts that have been presented in evidence to this jury that we go in the opposite direction and say that anybody over the age of 60 who has health insurance who files a claim is going to be entitled to an age discrimination claim.

It does appear the Trial Court was grappling with Martin's case, perhaps even adopting a "devil's advocate" stance, rather than ruling on the merits of his claim. At any rate, the Trial Court went on to deny Perma-Chink's requested relief. These

-15-

statements made by the Trial Court and cited by Perma-Chink do not undermine the validity of the Trial Court's ultimate exercise of its thirteenth juror function. The Trial Court clearly had questions, resolved those questions, and made its decision. We find no abuse of discretion in the Trial Court's declining to grant Perma-Chink's motion for a new trial.

Perma-Chink's final issue is whether the Trial Court erred in denying Perma-Chink's motion for a remittitur. Perma-Chink requests a remittitur based on an alleged faulty calculation of Martin's base pay used by the jury which included severance pay and paid time off, and the income Martin received from his nut roasting business following his termination at Perma-Chink. The record establishes that Martin, post-termination from 2013 and 2014, earned $20,219.05 from his nut roasting business. Our Supreme Court has stated:

> Where the trial judge has approved the verdict in its role as thirteenth juror—as the trial court did in this case—the Court of Appeals' review of the verdict and its ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980); *see also Thrailkill*, 879 S.W.2d at 841; *Ellis*, 603 S.W.2d at 129. Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905). An appellate court is required to take "the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501-02 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010)). The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *See Ellis*, 603 S.W.2d at 129 ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is *any* material evidence to support the award, it should not be disturbed." (emphasis added)). "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id.* Because the material evidence standard lies at the foundation of the right to trial by jury, if there

is material evidence to support a jury verdict, the appellate courts must affirm it. *See* Tenn. Const. art. I, § 6; *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979) (quoting *D.M. Rose & Co. v. Snyder*, 185 Tenn. 499, 508, 206 S.W.2d 897, 901 (1947)); *Crabtree Masonry Co.*, 575 S.W.2d at 5; *City of Chattanooga v. Ballew*, 49 Tenn. App. 310, 316-17, 354 S.W.2d 806, 808-09 (1961); *see also Grandstaff v. Hawks*, 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000) ("We have a duty to uphold a jury's verdict whenever possible.").

The Court of Appeals' authority to suggest a remittitur when the trial court has affirmed the verdict is far more circumscribed than that of the trial court. *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331 & n. 2 (Tenn. 1996); *see also Ellis*, 603 S.W.2d at 129. If the Court of Appeals suggests a remittitur, the plaintiff may either accept the remitted amount, opt for a new trial, or accept the remitted amount under protest and apply to this Court for permission to appeal. Tenn. Code Ann. § 20-10-103(a).

*Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422-23 (Tenn. 2013).

Perma-Chink's request is not based upon an argument that the jury's verdict inherently is excessive, per se, but rather that material evidence does not support this specific portion of the jury's verdict. In effect, Perma-Chink asks us, at least in part, to tinker with the amount of damages awarded Martin by the jury. This Court's ability to modify a jury's award is circumscribed heavily as discussed by our Supreme Court's opinion in the *Meals* case cited above. In the present case, the jury awarded Martin back pay of $132,040. The jury awarded Martin nothing for humiliation and embarrassment or emotional distress. The figure of $132,040 represents Martin's annual earnings at Perma-Chink in 2012, his final year at the company, multiplied by 2.15 to cover the approximately two-year period from his termination through trial. The Trial Court, deciding upon a post-trial motion, declined Perma-Chink's request for a remittitur to account for the $20,219.05 Martin earned at his nut roasting business.

On the issue of remittitur, we are constrained to take the strongest legitimate view of the evidence in favor of the verdict and discard all countervailing evidence. From our careful review of the record, it is apparent, however, that the jury failed to credit Perma-Chink for the income Martin earned from his nut roasting business following his termination from Perma-Chink. In the case of *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414 (6th Cir. 1999), the United States Court of Appeals, Sixth Circuit remanded a case for the district court to determine an appropriate remittitur in part based upon a failure to reduce back pay damages to account for other

-17-

income. Although that case dealt with the Age Discrimination in Employment Act rather than the THRA, we find the reasoning analogous.

With respect to the calculation of base pay, we find no reversible error. However, we find no legal justification whatsoever for the failure to credit Perma-Chink for the $20,219.05 Martin earned from his nut roasting business following his termination by Perma-Chink. We, therefore, find that the Trial Court erred in declining Perma-Chink's request for a remittitur, and instead suggest a remittitur in the amount of $20,219.05. Martin now may accept the remitted amount, opt for a new trial, or accept the remitted amount under protest and file an application to appeal to our Supreme Court.

We next turn to Martin's issues. We first address whether the Trial Court erred in denying Martin's supplemental motion for attorney's fees. In *Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002), we noted that "a determination of reasonable attorney's fees and costs is necessarily a discretionary inquiry" and that, normally, an appellate court will defer to the trial court's determination absent an abuse of discretion. Our Supreme Court has indicated that a trial court has abused its discretion when it "either applied an incorrect legal standard or reached a clearly unreasonable decision, thereby causing an injustice to the aggrieved party." *Kline v. Eyrich*, 69 S.W.3d 197, 204 (Tenn. 2002). To the extent that reasonable minds can disagree about the trial court's discretionary decision, such decision will be upheld. *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). Martin requested additional attorney's fees of $6,627.50 and costs of $70.20. These expenses were incurred in response to Perma-Chink's post-trial motions. We find no abuse of discretion in the Trial Court's declining to award Martin the additional attorney's fees.

We next address whether the Trial Court erred in denying Martin's motion for prejudgment interest. Our Supreme Court has stated:

An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

*Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citations omitted).

-18-

Martin notes that the jury awarded Martin two years of back pay, based upon his 2012 W-2 form. Martin, however, fails to articulate how the Trial Court abused its discretion in declining to award him prejudgment interest. Based on this record, we find no manifest and palpable abuse of discretion in the Trial Court's declining to award Martin prejudgment interest.

The final issue we address is whether Martin should be granted his attorney's fees and litigation expenses incurred on appeal. Our Supreme Court has stated:

> The plaintiff has asked this Court to award attorney's fees incurred in this appeal. The remedies provided by the THRA include "reasonable" attorney's fees. Tenn. Code Ann. § 4-21-306(a)(7) & -311. The plaintiff is the prevailing party in this suit and is entitled to relief under the THRA. The THRA does not require that the plaintiff prevail on all appellate issues before attorney's fees may be awarded. *See* Tenn. Code Ann. § 4-21-306 (providing that affirmative action ordered under the THRA "may include ... a reasonable attorney's fee"); *see generally Church of Scientology Flag Serv. Org. v. City of Clearwater*, 2 F.3d 1509, 1513 (11th Cir. 1993) (noting "well-settled" law that plaintiff is prevailing party if plaintiff has succeeded on any significant issue which achieves some of the benefit the parties sought in bringing suit). Accordingly, the plaintiff's attorneys are entitled to reasonable compensation for their time spent in pursuing this appeal. The issue is remanded to the trial court for a determination of a reasonable fee for the attorneys' services during the appellate process.

*Forbes v. Wilson County Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 422 (Tenn. 1998).

In light of Martin's prevailing on most issues at trial and on appeal, and, given the case precedent cited above, we, in the exercise of our discretion, find that Martin is entitled to an award of attorney's fees and litigation expenses incurred on appeal. On remand, the Trial Court is to determine and award those reasonable attorney's fees and litigation expenses incurred by Martin in defending this appeal.

In summary, we affirm the age discrimination judgment for Martin, but remand to the Trial Court for entry of a remittitur of $20,219.05. Martin may accept the remitted amount, opt for a new trial, or accept the remitted amount under protest and file an application to appeal to our Supreme Court. On remand, the Trial Court also is to determine and award Martin his reasonable attorney's fees and litigation expenses incurred on appeal.

**Conclusion**

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below, entry of a remittitur of $20,219.05 should Martin accept it, and for the determination of and award to Martin of his reasonable attorney's fees and litigation expenses incurred on appeal pursuant to the THRA. The costs on appeal are assessed against the Appellant, Perma-Chink Systems, Inc., and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE